## No. 15,379.

### TORBERT *v.* THE PEOPLE.
(156 P. [2d] 128)

Decided February 13, 1945.

Mr. RALPH J. CUMMINGS, for plaintiff in error.

Mr. GAIL L. IRELAND, Attorney General, Mr. H. LAWRENCE HINKLEY, Deputy, Mr. JAMES S. HENDERSON, Assistant for the people.

*In Department.*

MR. JUSTICE JACKSON delivered the opinion of the court.

PLAINTIFF in error was convicted under all three counts of an information alleging: 1, Cheating and swindling; 2, false pretenses; and 3, a confidence game. The trial court imposed a sentence of five to seven years. As grounds for seeking reversal in this court, plaintiff in error, whom we shall hereafter refer to as defendant, makes assignments of error which counsel for the defendant has epitomized, and counsel for the people have likewise discussed, under four headings: 1. The court should have granted defendant's motion to strike the testimony of witnesses McAfee, O'Neal, Filson, Hamilton and Dickman; 2. The trial court should have directed a verdict of not guilty as to count three charging confidence game; 3. The court should not have admitted in evidence, over the objection and exception of defendant, exhibits I, J, K, and L, being prospectuses by the Savol Supply Company, a Kansas corporation; and 4. The court should not have admitted in evidence, over the objection and exception of defendant, exhibits M, N, O, P, Q, R, S, and T, relating to the Cokano Investment Company.

All three counts are based upon dealings which defendant had with Margaret M. Carroll in Denver, occurring on or about the 8th day of July, 1939, in which the

latter exchanged her six shares of preferred stock and four shares of common stock (new) of the Cities Service Company for 103 shares of the common stock of the National Savol Company, a Colorado corporation—an exchange which was brought about by the solicitation of defendant and upon his representation that the stock had a valuation of $3.50 per share and in one or two years would be worth $5.00 per share. In the exchange, a valuation of $3.00 per share was placed upon the stock of the National Savol Company, which stock had a par value of one cent per share.

The evidence showed that defendant had organized a company in Kansas engaged in the manufacture and sale of automobile accessories known as Victor Specialty Company. This company acquired a patent pertaining to a compound to be mixed with lubricating oil, which it was claimed made the oil so mixed with it a better lubricant. Shortly afterward and on or about February 24, 1927, the name of this company was changed to the Savol Supply Company. About the same time the capital stock of Savol Supply Company was tripled, and in 1930 defendant began selling stock in his company to the general public. It was in this year that he moved to Colorado, and his stock selling campaign thenceforward took place in this state—he having been formerly a resident of Colorado.

September 23, 1930, the Cokano Investment Company was organized in Colorado. July 22, 1933, this company made application to the state of Colorado for registration as a dealer in securities, reciting that up to that time it had held title to real estate and water rights; and thereafter it engaged in the sale of stock of the Savol Supply Company, building and loan companies, Cities Service, and other similar stocks. Annual applications were made for licenses thereafter, to and including 1940. Licenses were issued by the Colorado Securities Commissioner until 1940, when he refused to renew the application made that year. He testified that the chief

activity of the Cokano Investment Company during this period was the sale of Savol stock.

January 3, 1939, the National Savol Company was incorporated in Colorado, with defendant as one of the three directors. One week later an exchange agreement was entered into between the Savol Supply Company of Kansas and the new Colorado corporation by which the bulk of the assets of the Kansas corporation were transferred to the Colorado company. Defendant testified that the reason for this was that two-thirds or three-fourths of his stockholders were residents of Colorado and preferred to own stock in a Colorado corporation. The testimony of Allen Redeker, a certified public accountant examining the books of the companies in question, showed that the principal assets of the Kansas company, which were taken over by the Colorado company, consisted of oil rights, formulae, patents and good will which were placed at a par value of $22,905.75; notes receivable amounting to $11,160.98; furniture and fixtures $215; and printing, stationery and supplies $50. The Colorado company assumed notes payable in the amount of $15,370.79 owing by the Kansas company; leaving an apparent surplus of assets over liabilities of $18,960.94, which was to be "liquidated or settled or paid for by turning over the stock of the Savol Supply Company after they had acquired the Colorado corporation, the National Savol Company." The auditor's comment on the various assets of the National Savol Company include the following: "I will first comment on the items as shown by the balance sheet as of June 30, 1940. The first item is cash $7.00. This was cash, according to the books, which was paid in by two of the qualifying directors when the company was organized, and I asked Mr. Torbert where the cash was and he said his wife had it in Kansas City, and he said the company had never opened a bank account. There are no cash receipts of any kind shown by the National Savol Company during the entire period for which I audited, ex-

cept this $7.00, and as I said, that $7.00 was not available for inspection."

The item of notes receivable entered as $11,160.98 he believed should be shown as of no value, the notes being considered worthless.

"The next asset is stocks and bonds. The records show that the company owned 53,021 shares of common stock of the Savol Supply Company, and 1401 shares of preferred stock of the Savol Supply Company, carried at a total book value of $159,967.76. I would like to make a little explanation as to that. In the first place, I again want to state that when the company was organized it took over the principal assets of the Savol Supply Company in Kansas, then the National Savol Company made an agreement with the Cokano Investment Company whereby they were permitted to exchange their stock with stockholders in Colorado who owned stock in the Kansas corporation, to take in exchange for that stock in the new National Savol Company an even exchange, share for share, and when that was done it was capitalized and set up at that book value. As I say, some 53,000 shares were exchanged of common, and 1400 shares of preferred were exchanged and were set up at a value of $159,967.76. I have eliminated that item from the balance; in the first place, because the charter of the Savol Supply Company in Kansas had been forfeited, and furthermore, as the principal assets of the company had already been transferred to the Colorado corporation, there certainly could be no value to that extent left in the other company; and furthermore, the charter had been forfeited, and therefore I have eliminated that item. Then capital stock issued as collateral amounts to $2,751.08. This is a similar item as I have explained in the Cokano Investment Company, where the Cokano Investment Company went out and borrowed money from certain individuals and gave as collateral stock of the National Savol Company, and then later on turned these notes over to the National Savol Company and

they assumed that liability, so it is a continuation of that original transaction.

"Oil rights, patents and good will, $300,000. As I stated before, the value was set up on the books according to the exchange agreement which they had with the Savol Supply Company. The value I placed on that under adjusted balance is $22,905.75. The first entry on the books show that it was set up at that date. On the same date an entry was made increasing the value $277,094.25, and crediting that item to surplus. I have eliminated the $277,094.25, leaving $22,905.75, and even that value which I have left on here as of June 30th is not proper according to accounting proceedings, because a patent runs for a period of only seventeen years, so when you come to the end of that period, then there should be no life left in that. I have not done that in this case because I was not able to determine the actual cost of this patent, because it had been acquired from the National Savol Company [Savol Supply Company] and I was unable to determine. However, this patent expires on March 8th, 1944, and it therefore has a period left from the date I made the audit of not quite three years, so the life of that patent is very short, and as I say, the value should be written down materially, but for the benefit of this statement I have allowed it to stand at the $22,000 figure, which was the amount stated in the exchange agreement. Q. Is there any other reason why you have eliminated that item? A. The only reason, from the accountant's viewpoint, that a patent should ever be increased in value is on the ground of good will, where earnings are shown as the result of a certain patent, and if that is the case, in case of a sale we allow a greater value on account of those accrued earnings. However, in this case the National Savol Company does not show any income from the source of this patent whatever. Q. You left the value at $22,000? A. I have still left the value at $22,000. I

did not know how to arrive at it, and I left it at that value."

Defendant on cross-examination testified that to the best of his recollection they gave $100 for a one-third interest in the patent, and his testimony also contained some reference to the possibility of another one-third interest having been purchased for $100. It would appear that the auditor's doubt as to whether the $22,000 value for patents was justified is modestly expressed. But even after allowing that $22,000 item to stand and then making the adjustments referred to above, the auditor testified that there was an excess of liabilities over assets, i.e., an actual deficit of $52,960.66, instead of the surplus of $385,002 shown on the company's records. It further appeared that the stock of the company was worthless, not only from a balance sheet standpoint, but from an earnings basis, the company having shown an operating deficit of $5,640.78 over the period from January 3, 1939 to June 30, 1940. From defendant's own testimony, it appeared that the company had never had a checking account.

Two of the four assignments of error relate to the admission in evidence of prospectuses of the Savol Supply Company and documents relating to the Cokano Investment Company. It has already been seen how intimately the Savol Supply Company, the Kansas corporation, was connected with the National Savol Company, the Colorado corporation, the former having transferred to the latter the bulk of whatever the former owned, and the latter then showing in its balance sheet the large holding of stock in the former. It remains to add that there was also evidence showing that the Cokano Investment Company held stock in the National Savol Company, and the latter held stock in the former, that sales of the Savol company to the public were negotiated by a sales contract between each individual purchaser and the Cokano Company, that the latter company had only eight stockholders, among whom was

defendant, his wife, and the National Savol Company. Defendant himself admitted that he had made the following statement before the grand jury: "The undersigned is president, director, treasurer and general manager of the National Savol Company, and president, director, treasurer and general manager of the Cokano Investment Company; he is the largest individual stockholder in each company, and that the books and records of both of said corporations are in reality the personal acts of this respondent, though nominally those of said corporations, and said disclosures as are therein contained are virtually disclosures of respondent."

There was evidence to show that a careful evaluation of the items in the Cokano Investment Company's balance sheet would disclose the stock of that company to be worthless.

It is thus apparent that evidence concerning the Savol Supply Company and the Cokano Investment Company was pertinent and necessary in presenting an accurate picture of the status of National Savol Company. In the case of the Cokano, it was also pertinent in respect to the earnings of the two Colorado companies, for there was evidence showing that defendant did not account to the Cokano company for either all of the assets or commissions that properly belonged to that company. Apparently none of the moneys arising from the sales of National Savol Company stock reached the latter's treasury, either directly or indirectly.

██ ██ Counsel for defendant also alleges error in that the court did not direct a verdict of not guilty as to count three of the information, charging the defendant with the use of a confidence game. Reference is made to the fact that the court, at the close of the state's evidence, made the remark: "I think I will take the third count away." He later reconsidered and allowed it to go to the jury with the other two counts. We believe this was justified, as there seems to have been evidence from which the jury might reach the con-

clusion that this case involved the use of "some false or bogus means, token, symbol or device, as distinguished from mere words, however false or fraudulent." *Wheeler v. People,* 49 Colo. 402, 113 Pac. 312; *Chilton v. People,* 95 Colo. 268, 35 P. (2d) 870. In any event, we see no prejudicial error in view of the fact that the penalty for committing a confidence game is much less than that for obtaining money under false pretenses. This case does not involve consecutive sentences. There was simply the one sentence of imprisonment for from five to seven years—a term which could only be supported by a finding of guilty under the "false pretenses" count.

Counsel for defendant perhaps lays greatest stress on the assignment that the court should have granted defendant's motion to strike the testimony of witnesses McAfee, a widow who worked in private families, O'Neal, an unemployed widow, Filson a retired teacher, Hamilton, a retired teacher working on the sugar board, and Dickman, a practical nurse doing janitor work. All five testified to having been sought out by the defendant and persuaded by him to invest in varying amounts of National Savol Company stock.

█ Counsel relies upon the general rule that evidence is not admissible which shows or tends to show that the accused has committed a crime wholly independent of the offense for which he is on trial and cites *Warford v. People,* 43 Colo. 107, 96 Pac. 556; *Jaynes v. People,* 44 Colo. 535, 99 Pac. 325; *Webb v. People,* 97 Colo. 262, 49 P. (2d) 381; *Munfrada v. People,* 99 Colo. 80, 60 P. (2d) 223; *Wood v. People,* 60 Colo. 211, 151 Pac. 941.

The Attorney General, admitting the existence of the general rule as set forth above, contends that this case comes within a well-known exception to the general rule, an exception that is well expressed in *Elliott v. People,* 56 Colo. 236, 240, 138 Pac. 39, as follows: "The authorities are quite uniform to the effect that when

the guilt of a defendant depends upon the intent, purpose or design, with which an act was done, other transactions of a similar nature on his part may be examined into, for the purpose of establishing such guilty intent, design, or purpose; although the facts thus elicited show the commission of another crime, provided such extraneous transactions are so connected as to time and so similar in their other relations that the same motive may be reasonably imputed to them all." We applied this rule in *Tracy v. People,* 65 Colo. 226, 176 Pac. 280, *Whitfield v. People,* 79 Colo. 108, 244 Pac. 470, *Bacino v. People,* 104 Colo. 229, 90 P. (2d) 5, and *Thorp v. People,* 110 Colo. 7, 129 P. (2d) 296. The trial court in the instant case protected the rights of defendant and accurately stated the rule when, in instruction 19, in commenting on this evidence of transactions with others, he said: "This evidence is admissible only as bearing upon the question of whether or not the defendant had a plan or design to produce a result of which the act charged in the information was a part, and you can consider such evidence for no other purpose. The defendant cannot be tried for or convicted of any offense not charged in the information."

█ Counsel for defendant implies that some of these other transactions may have been legitimate. If so, defendant can not be prejudiced by proof of them. *Clarke v. People,* 53 Colo. 214, 125 Pac. 113. If not, then they would seem to fall within the exception to the rule above discussed. In that very ambivalent quality, this evidence of transactions with the five other persons, differs from the other crimes, admission of evidence of which was held to be error in the cases cited by defense counsel.

In the instant case, the evidence showed that securities which defendant acquired from his prospects in trade for National Savol Company stock were usually promptly sold through various brokerage and stock exchange firms in the city of Denver. These sales of

stock for the account of the Cokano Investment Company, the greatest portion of which was Cities Service stock, netted over $47,000 in cash—some of which seems not to have been accounted for on the books of any of the companies involved. In reply to many questions concerning the affairs of these companies with which he, who was president, general manager, and treasurer, should have been familiar, defendant professed ignorance, or replied that he was no bookkeeper.

A careful examination of the record in this case leads us to the conclusion that defendant had a fair trial and that no prejudicial error appears therein.

Judgment is affirmed.

MR. CHIEF JUSTICE BAKKE and MR. JUSTICE KNOUS concur.