## No. 18,515.

### Chester V. Stull *v.* People of the State of Colorado.

(344 P. [2d] 455)

Decided September 21, 1959. Rehearing denied October 13, 1959.

Messrs. LATTIMER & ROBB, Mr. ALFRED Z. CRADDOCK, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, for defendant in error.

*En Banc.*

MR. JUSTICE FRANTZ delivered the opinion of the Court.

STULL was accused by information of the crime of receiving stolen goods, and upon trial was found guilty by the jury. From the ensuing judgment and sentence he

sues out this writ of error. In the proceeding before us he assigns twenty-six grounds for reversal, all of which easily fall into five general categories. One of these, insufficiency of evidence to sustain a conviction, compels reversal of the judgment, and to this we now attend.

The chief prosecution witness, an unmarried female, was the cashier-bookkeeper of the Rocky Mountain Bank Note Company. Stull, a married man, was a salesman for the company, and his duties required considerable travel in the states of Colorado and Kansas.

In her testimony this witness related how the friendship between her and Stull developed; how she traveled to distant points to be with him; and how by embezzlement she obtained money from her employer to turn over to him. It appears from her testimony that she told Stull that she "might receive" some money from a Frank Smoot upon his death. The record is not clear as to the date of his death, although it may be fairly inferred that he died during the time the witness was advancing money to Stull.

Actually, she gave him money on several occasions in an envelope at the dock of the company, during working hours. There was no showing that other persons were not at the dock when these moneys were delivered to him. Testimony as to when and how she paid gambling losses is not clear; the evidence does not indicate that it was covertly done. She paid a great many of his bills directly, and his business expenses may have been, for aught the record reveals, taken care of openly.

She testified that she never told Stull the source of the money she was turning over to him. When the company learned of her defalcations, she called Stull, who was absent from the city, and told him for the first time that she had been embezzling money and advancing it to him. In this conversation she asked Stull not to hate her, and further testified:

"Q. Now, what was the reason for saying, then, to Mr. Stull on the 'phone, 'Please don't hate me.' A. I didn't

want anybody to despise me, him or anybody else for what I had done. Q. Then, you were afraid, then, that when Mr. Stull found out you were embezzling money from the bank note company, that he might hate you, is that right? A. Not necessarily. Q. You said this to Mr. Stull? A. Well, yes, I guess that would be it, then."

Other witnesses testified to the fact that Stull had deposited these sums in bank accounts, one of which was an out-of-state bank. It would appear that the purposes for which Stull said he needed the money were generally not the purposes for which he obtained the money. Notwithstanding he had this money in several bank accounts at the time her misdeeds were discovered, and notwithstanding her request that he make provision to return the money so that she could make her employer partially whole, Stull lied to her, telling her of his inability to get the money. Other circumstantial evidence of similar import was relied upon.

An integrant of the crime of receiving stolen property is knowledge that it has been stolen. C.R.S. '53, 40-5-12; *Curl v. People,* 53 Colo. 578, 127 Pac. 951, Ann. Cas. 1914 B, 171; *Sitterlee v. People,* 67 Colo. 523, 186 Pac. 527. Interrogation as to Stull's knowledge that the money delivered to him was embezzled evoked negative responses; not one witness testified that the accused knew the money was embezzled, but, on the contrary, such testimony as was elicited on the subject was to the effect that he did not know. Negation of "the essential element of guilt — defendant's knowledge that the property was stolen at the time he received it —" makes an incomplete case, one which should not have been submitted to the jury for deliberation and verdict. *Sitterlee v. People,* supra.

Being confronted with the question whether there was knowledge on the part of Stull that the money was embezzled at the time he received it, our answer must be that as the possibility of it cannot be denied, so neither can the probability of it from the proof adduced

be affirmed. Proof that ascends no higher than the level of suspicion, surmise or conjecture has no substance in our system of jurisprudence, whether the problem considered be criminal or civil. *State v. Oxendine,* 223 N.C. 659, 27 S.E. (2d) 814 (receiving stolen goods case); 1 Underhill's Criminal Evidence (5th ed.) §17, pg. 21, 22; 1 Wharton's Criminal Evidence (12th ed.) §11, pg. 26, 27; *Neal v. Wilson County Bank,* 83 Colo. 118, 263 Pac. 18; *Denver & R.G. R. Co. v. Thompson,* 65 Colo. 4, 169 Pac. 539. See *Sitterlee v. People,* supra.

In our view this evidence lacked the content necessary to permit submission of the case to the jury. In fact, much of the evidence for the prosecution directly disproved knowledge on the part of Stull that the money was embezzled. In this respect the District Attorney is to be commended. As an officer of the State, he represents the people, of whom the defendant is a member, and his duty is to present all available evidence tending to aid in ascertaining the truth. Be it remembered that the State is just as intensely interested in the acquittal of the innocent as it is in the conviction of the guilty. *State v. Guilfoyle,* 109 Conn. 124, 145 Atl. 761.

There is considerable similarity between the present case and the case of *Monteresi v. State,* 160 Fla. 489, 35 So. (2d) 582. We quote:

" * * * Here a trusted employee, over a period of years — from day to day, misappropriated about $9,514.30 of his employer's money and gave it to appellant to play a number game commonly known as Bolita. Appellant would call upon the employee just before or after the usual working hours to get the money. The sums ranged from one to three hundred dollars a week. In the meantime all winnings were played back into the game. Finally the employer was called to meet an overdraft and learned, for the first time, of the embezzlement.

"[1] It was necessary for the state to show that appellant knew * * * that the money was embezzled. In this regard this statute is similar to the companion law

of receiving stolen property. Sec. 811.16, Fla. Stat., 1941, F.S.A.

"[2] We find a total lack of evidence to meet the announced rule. We cannot attach guilty knowledge to appellant simply because the money was passed to him out of the usual hours of business and out of the presence of others. The evidence, in its present state, is insufficient to sustain a conviction. The judgment is reversed and a new trial is granted."

Our determination that the evidence was insufficient to justify submission of the case to the jury ordinarily would make unnecessary the consideration of any of the other points ascribed as grounds for reversal; but we cannot leave unnoticed the procedure adopted by the trial court in receiving evidence of so-called similar transactions, because it followed dangerous innovation where once an established mode prevailed, and in resorting to such innovation the trial court used a pattern for the admission of evidence of other transactions which should not be emulated, ever. Motivation for our discussing the similar-transactions doctrine springs from (1) the fact that this court has permitted a creeping corruption of the rule and its application to develop by inconsistent pronouncements in its decisions, and (2) an abiding desire to keep future error from emerging in this or any other trial in which recourse is had to this kind of evidence. That the trial court was led astray is understandable when a review of our decisions reveals an appalling internal inconsistency in the similar transactions rule and how it shall be used.

A defendant should be tried only for the offense with which he stands charged. *Gill v. People,* 139 Colo. 401, 339 P. (2d) 1000, Decided June 1, 1959. He should not be tried for a crime wholly independent of the offense for which he is on trial. Nor should he be expected or required to meet anything other than the specific accusation made against him. An accused has the right to know precisely what he is to defend against.

■ And a presumption of guilt should not be generated against an accused by showing that he committed a crime indicative that he is a depraved person who likely would commit the crime for which he is being tried. Basic to our criminal law concepts is the commandment that: "Thou shalt not convict a person of an offense by proof that he is guilty of another."

Bearing in mind that evidence of similar acts has inhering in it damning innuendo likely to beget prejudice in the minds of jurors, and that such evidence tends to inject collateral issues into a criminal case which are not unlikely to confuse and lead astray the jury, it becomes exigent that courts observe the fine balance in regard to such evidence that must exist between the necessity of proof on the part of the prosecutor and the danger of unfair prejudice to the defendant *Warford v. People,* 43 Colo. 107, 96 Pac. 556; *Jaynes v. People,* 44 Colo. 535, 99 Pac. 325, 16 Ann. Cas. 787; *Webb v. People,* 97 Colo. 262, 49 P. (2d) 381.

To cope with the intrinsic dangers of admitting in evidence proof of similar acts and yet to make available such evidence in the proper setting, this Court has from time to time laid down some rather stringent conditions for the admission of evidence of other conduct of the defendant. These conditions are rules which have as their aim the equilibration of the necessity of proof and the danger of unfair prejudice, of which we have just spoken.

■ We enumerate. First, the prosecutor should advise the trial court of the purpose for which he offers the evidence. Secondly, if the court admits such evidence, it should *then and there* instruct the jury as to the limited purpose for which the evidence is being received and for which the jury may consider it. Thirdly, the general charge should contain a renewal of the instruction on the limited purpose of such evidence. Lastly, the offer of the prosecutor and the instructions of the court should be in carefully couched terms: they

should refer to "other transactions," "other acts," or "other conduct," and should eschew such designations as "similar offenses," "other offenses," "similar crimes," and so forth. For an excellent discussion of this phase of the criminal law, see Melville, Criminal Evidence, page 9 et seq.

"When such testimony is received, the trial judge should *then* limit it to the purpose for which it is admitted. Perhaps we have never determined that a failure to so limit it when not requested by the defendant is reversible error, but we have intimated in Warford v. People, supra, that this course should be pursued by trial courts. We also think that, when evidence of the character under consideration is offered by the district attorney, *good practice requires* that he should state the purpose for which it is offered, and that the trial judge *in instructions given,* when requested by the defendant, should instruct the jury on the subject of the purpose for which they may consider such testimony. These precautions should be observed, because of the fact, as above indicated, that such evidence tends to create a prejudice in the minds of the jury; but of this he will not be permitted to complain if the evidence is competent, and his rights are safeguarded in the manner we have sugested." (Emphasis supplied.) *Jaynes v. People,* supra.

When asked in the instant case what purpose the prosecutor had in offering certain evidence, he stated that it was "offered to show plan, scheme and design," and that "this is being offered as one of the circumstances * * * which bears upon the knowledge, and also bears upon the plan, scheme and design which were the transactions or similar." After argument the trial court determined to admit the evidence, whereupon the following colloquy took place:

"Mr. Robb: I would like to ask one thing. You will give an instruction to the jury at this time as to what this — "The Court: No, if the case is submitted to the

Jury, I will give an instruction covering this particular evidence. Mr. Robb: Note an exception."

In the general charge the Court advised the jury as follows:

"You are instructed that there has been testimony introduced here which might have a tendency to *show participation by the defendant in offense* other than that charged in the information. You are further instructed that the defendant is entitled to be tried on the charge contained in the information and upon no other, and you are to consider the evidence concerning the activities of this defendant prior to the acts with which he is charged in the information only so far as you deem them explanatory of the events leading up to and surrounding the acts charged in the information." (Emphasis supplied.)

█ 1. The district attorney should state the purpose for which evidence of similar acts or transactions is offered. This is the first requisite to a proper application of the rule. *Jaynes v. People,* supra; *Reppin v. People,* 95 Colo. 192, 34 P. (2d) 71; *Schneider v. People,* 118 Colo. 543, 199 P. (2d) 873. Such requisite is but one aspect of the general rule requiring a party to show the relevancy of evidence, to the admission of which objection has been made and the propriety of its reception for any purpose thereby put in doubt. *Farwell Co. v. McGraw,* 13 Colo. App. 467, 59 Pac. 231; *Baldwin v. Central Sav. Bank,* 17 Colo. App. 7, 67 Pac. 179; *Byers v. Tritch,* 12 Colo. App. 377, 55 Pac. 622; Nichols, Applied Evidence, pg. 3350 et seq.

█ 2. Upon *request* of the party adversely affected by admission of evidence of other acts or transactions the trial court should, at the time of its reception, direct the jury as to the only purpose for which it may be considered. Again, this is but one facet of the general rule regarding the admission of evidence for a particular purpose only.

█ It will be noted that counsel for Stull requested

a limiting instruction at the time the trial court admitted the testimony of other acts in evidence, and that the trial court denied the application. Such denial is reversible error. Besides *Jaynes v. People,* supra, there are a number of decisions proposing that such an application, timely made, should be granted. *Warford v. People,* supra; *Hillen v. People,* 59 Colo. 280, 149 Pac. 250; *Cargill v. People,* 73 Colo. 218, 214 Pac. 387; *Reppin v. People,* supra; *Dockerty v. People,* 96 Colo. 338, 44 P. (2d) 1013; *Grandbouche v. People,* 104 Colo. 175, 89 P. (2d) 577; *Williams v. People,* 114 Colo. 207, 158 P. (2) 447, 159 A.L.R. 509; *Sanders v. People,* 109 Colo. 243, 125 P. (2d) 154; *Schneider v. People,* supra. Other decisions apparently approving the same protective procedure are *Housh v. People,* 24 Colo. 262, 50 Pac. 1036; *Chipman v. People,* 24 Colo. 520, 52 Pac. 677; *Schuette v. People,* 33 Colo. 325, 80 Pac. 890; *Clarke v. People,* 53 Colo. 214, 125 Pac. 113; *Max v. People,* 78 Colo 178, 240 Pac. 697; *Roll v. People,* 78 Colo. 589, 243 Pac. 641.

And such limitation in aspects other than similar transactions has been sanctioned in recent cases. *Brown v. People,* 124 Colo. 412, 238 P. (2d) 847; *Bernard v. People,* 124 Colo. 424, 238 P. (2d) 852; *Thompson v. People,* 139 Colo. 15, 336 P. (2d) 93. This Court recited the procedure employed by the trial court in these words in approving its action:

"On various occasions throughout the course of the trial the district attorney offered evidence indicating flight, escape and attempted escape, but all on the part of either one or both Bernard and Sexton. Proper and prompt objection to the receipt of such testimony was made on behalf of defendant Brown, and, in each instance, *the court carefully advised and cautioned the jury* that such evidence did not apply to this defendant, and should not be considered by the jury in connection with him. Furthermore, *in its final written instructions* the Court included one on escape and attempted escape wherein it specifically directed the jury not to 'consider

any such evidence against any defendant who had not, under the evidence herein, escaped or attempted to escape.'" (Emphasis supplied.) *Brown v. People,* supra.

Here is what this Court said in a civil suit involving evidence of similar conduct (*Melcher v. Beeler,* 48 Colo. 233, 110 Pac. 181, 139 Am. S.R. 273):

"* * * At the trial the plantiffs offered, and the Court admitted in evidence over the objections of the defendant, two letters reflecting upon the business integrity of the plaintiffs, which were not counted upon in the complaint as constituting libels for which damages were claimed. Prior and contemporaneous publications of similar import to those for which damages are claimed in an action for libel are competent to show malice; hence, in the case at bar, the letters objected to were competent for that purpose and the general objection to their admission was properly overruled. They were admitted, however, without any caution to the jury to the effect that they could only be considered on the question of malice. Counsel for the defendants at the time the letters were introduced made no request for a cautionary instruction limiting the purpose for which the letters were competent; but, nothwithstanding this omission upon their part, we think *the better practice is that when testimony is competent only for some particular purpose, that the Court should so advise the jury, at the time of its introduction;* but by this suggestion we must not be understood as holding that it is error for the Court not to do so *when counsel objecting to its reception failed to make a request of the Court to advise the jury for what purpose it is competent. * * *"* (Emphasis supplied.)

And there is such compelling reason for a trial court to immediately instruct the jury for what purpose it may consider evidence admitted only for a particular purpose. Perhaps no better statement of the reason can be found than that appearing in *State v. McCurtain,* 52 Utah 63, 172 Pac. 481:

"Before leaving this subject we desire to add, however, that it is by far a better and safer practice in any case where evidence is admissible for a certain purpose or as against a particular defendant that the Court, *at the time the evidence is received, instruct* and admonish the jury of the purpose for which the evidence is received and tell them that they should not consider it for any other purpose. *If that not be done the jurors will be very apt to consider the evidence for every purpose, and the matter will be thus fixed in their minds which will not easily be eliminated by an instruction given at the conclusion of the trial which, in many cases, the jury will not receive until many days after the evidence has been received.* An instruction may thus fail to produce the desired effect. As a matter of course, it is always proper to also charge the jury at the conclusion of the trial of the purpose for which certain evidence was received and may be considered. It will be more likely, however, to produce the desired effect if the jury is told at the time the evidence is received the purpose for which it is received and may be considered by them. To follow the course just outlined will also obviate the very error which is insisted on in this case." (Emphasis supplied.)

To like effect is the opinion of Judge Phillips, speaking for the 10th Circuit Court, in *Minner v. U.S.,* 57 F. (2d) 506. See *People v. Carmichael,* 314 Ill. 460, 145 N.E. 673.

Unfortunately, this salutary rule has not had uniform application. Sometimes the Court has held or intimated that a defendant was adequately protected by a cautionary instruction contained in the general charge, advising the jury of the purpose of such evidence and directing them to consider it for such purpose only. *Helser v. People,* 100 Colo. 371, 68 P. (2d) 543; *Torbert v. People,* 113 Colo. 294, 156 P. (2d) 128; *Wolf v. People,* 117 Colo. 321, 187 P. (2d) 928; *Armijo v. People,* 134 Colo. 344, 304 P. (2d) 633.

In some cases no request was made at the time of admission for a limiting instruction. Even when such has occurred this Court has suggested as the best procedure that the trial court should on its own motion advise the jury that the evidence is being received for a particular purpose and should not be considered by the jury for any other purpose. *Warford v. People,* supra; *Jaynes v. People,* supra; *Melcher v. Beeler,* supra; *Williams v. People,* supra.

Our system of jurisprudence is always striving toward the unattainable — perfection. At the very least, judicial action should conform to the best rule. Whenever and wherever the best rule can be used, it should be invoked. Indeed, experience at finding the best has been one of the chief methods by which the rules of the common law were developed.

Exceptions to the rule announced in the Jaynes case are indicated in two opinions. An exception was forged out of a situation where the district attorney, at a time within the discretion of the trial court, must elect upon which of a series of acts he will stand. *Shier v. People,* 116 Colo. 353; 181 P. (2d) 366. Another possible exception might be inferred from dicta in *Schneider v. People,* supra, involving a confession encompassing other murders similar to the one charged against the defendant.

 3. The trial court should instruct the jury on the limited purpose of evidence of other acts or transactions in its general charge. Decisions from this Court abound with holdings to this effect. We cite those in which it appears, either by express pronouncement or by fair inference, that evidence of other acts or transactions had been or should have been admitted where the district attorney had or should have advised the trial court the purpose for which such evidence was offered, and the court thereupon had or should have cautioned the jury for what purpose it might consider such evidence, and finally had or should have instructed the jury on the particular purpose of such evidence in its general charge.

*Warford v. People,* supra; *Jaynes .v. People,* supra; *Meyers v. People,* 65 Colo. 450, 177 Pac. 145; *Dockerty v. People,* 74 Colo. 113, 219 Pac. 220; *Whitfield v. People,* 79 Colo. 108, 244 Pac. 470; *Reppin v. People,* supra; *Dockerty v. People,* 96 Colo. 338, 44 P. (2d) 1013; *Schneider v. People,* supra; *Wolff v. People,* 123 Colo. 487, 230 P. (2d) 581; *Moore v. People,* 125 Colo. 306, 243 P. (2d) 425; *Hood v. People,* 130 Colo. 531, 277 P. (2d) 223.

These eleven cases, just cited, represent a substantial body of law on the matter of the procedural requisites for the admission of other acts or transactions. They begin with *Warford v. People,* supra, decided in 1908, and conclude with *Hood v. People,* supra, decided in 1954, and hence the rule they espouse has attained a durability and maturity that should convince of its wholesomeness and utility.

So much more could be written about the three requisite procedural steps: (1) the duty of the district attorney to inform the court of the purpose of offered evidence of other acts or transactions; (2) the duty of the court at the time of receiving such evidence to advise the jury of the limited purpose for which it may be considered; and (3) the duty of the court in instructing the jury to again inform the jury of such limited purpose in the general charge; but further discussion would unduly lengthen this opinion. The last requisite has to do with the substantive element of the rule regarding other acts or transactions. This element will now be considered.

4. Trial courts should avoid the use of the terms, "other crimes," "other offenses," "similar offenses," "separate and other offenses," and kindred expressions in cautioning the jury at the time of admitting evidence of other acts or transactions, and in instructing them in the general charge. "The prisoner relies, and has a right to rely, upon the court to see that he has a fair trial." *White v. People,* 8 Colo. App. 289, 45 Pac.

539. Does the prisoner have a fair trial where the trial court labels conduct, other than that for which he is being tried, as another offense or crime?

On January 11, 1943, the answer appears to have been, "He does"; for on that day a rehearing was denied in the case of *Montez v. People*, 110 Colo. 208, 132 P. (2d) 970. It was said in that case:

"By Instruction No. 17 the jury was informed that evidence of 'separate and other *offenses*' had been admitted for the purposes above stated and could be considered by them for no other purpose, and that 'The defendants cannot be tried for, nor convicted of, any offense not charged in the indictment.' Defendants claim that by use of the word 'offenses' as first employed in the instruction the court advised the jury that the transactions referred to, which generally were similar to the one charged, were crimes and, hence, in effect, *said as a matter of law that defendants were guilty of the latter*. While in view of the context, the use of the word 'transactions' instead of 'offenses' might have been preferable, the clarity of the remainder of the instruction convinces us that the jury could not have been misled nor the defendants injured thereby." (Emphasis supplied.)

One week after the rehearing was denied in the Montez case, the court's answer to the question appears to be, "He does not"; for there was released at that time the opinion in *Johnson v. People*, 110 Colo. 283, 133 P. (2d) 789, in which it was held:

"Error is assigned to the giving of Instruction No. 15 which is as follows: 'You are further instructed that there has been testimony submitted in this case as to separate and other offenses than the offense charged in the indictment filed herein. You are instructed that the said testimony is not to be considered by you as to the guilt or innocence of the defendants herein of the offense charged in the indictment, but is admitted for the pur-

pose of showing intent, design or system, and is to be considered by you for no other purpose.'

"It is contended that the court should not have stated in effect that the charge in this indictment was an offense and that there were other offenses committed by defendants in addition to the one charged; in other words, that defendants were not only offenders, but continuing offenders. Whether the transactions admitted in evidence other than the one charged in the indictment were similar, and whether they showed a criminal intent in the transaction made the basis of the charge, or that the latter was a part of a scheme or plan to defraud the county, was for the jury to determine from all the surrounding facts and circumstances of the case, and *it was prejudicial error for the court to tell the jury that the other transactions were offenses as matter of law.* * * * The prejudice resulting from a failure to clearly instruct a jury as to the effect to be given evidence of similar transactions is pointed out in *Jaynes v. People,* 44 Colo. 535, 99 Pac. 325, and we need not here reiterate the statements there made."

There is no way in which the language of these two cases can be reconciled. Firmly convinced that *Johnson v. People,* supra, states sound law, and since it is the later decision, we adhere to, and reaffirm, its pronouncement. Particularly should we do so, because the word, "transactions," used by the trial court, received special approbation by this court in the later case of *Moore v. People,* supra.

Decisions of this court have approved the reception of evidence where the trial courts have properly safeguarded the defendant and have advised the jury in terms of "other acts" or "other transactions." *Meyers v. People,* supra; *Torbert v. People,* supra; *Silliman v. People,* 114 Colo. 130, 162 P. (2d) 793; *Moore v. People,* supra.

Instructions using the terms, "similar offenses," "separate and other offenses," "similar crimes," and the like

are bad for three very good reasons: (1) the trial court may not direct a verdict of conviction, for in doing so it invades the province of the jury. *Rowan v. People,* 93 Colo. 473, 26 P. (2d) 1066; *Carson v. People,* 93 Colo. 478, 26 P. (2d) 1068. Nor may it by indirection accomplish such purpose. To the jury the same kind of conduct being deemed by the trial court an offense committed at another time would logically lead the jury to believe the proof offered to sustain the charge established the offense. The magic of mathematical certainty would tug at the jurors' minds: certain facts equal an offense, ergo, same kind of facts should equal an offense. (2) To be an offense it must be proved by the same quantum of proof as the crime for which the defendant is being tried. The trial court may not by indirection avoid the requirement of proof beyond a reasonable doubt where it wishes to dub another act as an offense. To the jury cursory proof of an act labelled by the trial court "another offense" or "similar offense," etc., makes greater proof regarding the charge tried before them loom as something overwhelming. (3) It is out of tune with *Johnson v. People,* supra, *Torbert v. People,* supra, and *Moore v. People,* supra.

For the reasons herein stated, the judgment is reversed, with directions to dismiss.

MR. CHIEF JUSTICE KNAUSS, MR. JUSTICE MOORE and MR. JUSTICE DOYLE dissent.

MR. JUSTICE DOYLE dissenting:

I respectfully disagree with the majority conclusion and reasoning that the evidence was legally insufficient and also with the alternative basis that there was error in connection with the "similar transaction" instruction to the jury. Since the case turns on insufficiency of evidence, it becomes necessary to analyze the facts in some detail.

1. *The Question Whether the Evidence was Sufficient.*

The important prosecution witness was Betty Keator, the active embezzler. She was the person in the position of trust who had obtained many thousand dollars and had "given" most of it to the defendant herein. The information was signed and verified by Bert F. Scribner, manager of The Rocky Mountain Bank Note Company. A reading of Betty Keator's testimony does not indicate that she was "prosecution-minded." Rather it suggests that she was somewhat reluctant and hence the more credible.

Betty Keator was cashier-bookkeeper for Rocky Mountain Bank Note Company at its Pueblo office. She administered the petty cash fund which amounted to $5,000.00 to $7,000.00, and this involved the payment of small bills of the company and included the disbursement of expense money to the salesmen, including Stull, defendant herein. She manipulated this petty cash fund so as to obtain money to spend on or give to the defendant. She sometimes obtained the counter-signature of the manager on checks before running them through the protectograph. Having obtained the counter-signature she would then raise the amount and cash the check. At other times she would take petty cash or would cash incoming checks. Most of the peculations occurred in the two years immediately prior to June 6, 1956.

To the knowledge of Stull, Betty Keator earned a maximum of $400.00 per month, and lived in a $40.00 per month rented house with her mother. At the same time she wore very expensive clothes and had three different late model cars during the period in question, including at the end a 1956 Oldsmobile. She also spent large sums of money on Stull's entertainment, often flying by plane to meet him in Wichita, Kansas, in order to spend weekends or vacations with him.

There is no suggestion that Keator embezzled any money prior to her acquaintanceship with Stull in late

1951 or 1952 at which time he was assigned by the Bank Note Company to a territory in the Pueblo area.

The personal relationship, so important to a correct evaluation of this evidence, had its inception in taverns. Stull, Betty and at times others would meet after work for drinks and would then play "dollar bill poker." Stull (according to Betty) invariably won these games and his winnings amounted to $15.00 or $25.00 and sometimes more. As time went on the bets increased to $10.00, $15.00 or $20.00. The embezzlements started by taking sums out of the cash drawer in order to pay off the gambling debts.

In September 1955, according to Betty Keator, Stull came to her and told her that he needed $1500.00 in order to go into a uranium deal. She cashed checks to the company and took cash out of the petty cash fund in order to accumulate this amount and then delivered it to him. Then about two months later he came into the office and told her he needed $750.00 and that he would tell her about it over a drink that night. This sum was also obtained and paid to him.

In January 1956, Stull obtained $2,000.00 in the same manner on the pretext that he was entering a Muzak transaction in Kansas. The familiar mode of operation was followed in order to obtain this sum for him.

In April of 1956 on the occasion of Stull's being arrested for a traffic offense, he obtained $500.00, according to Keator's testimony, in order to pay his fine and expenses in connection with it.

The transaction charged in the information occurred on June 7, 1956. On this occasion the sum of $3800.00 was delivered to Stull. Leading up to this item Stull asked Betty to invest in a restaurant business involving the total sum of $5800.00. He stated that he could raise $2000.00 if she could get the remainder. She thereupon raised and converted three company checks and one payable to the company and delivered the sum to Stull in currency contained in an envelope. This, as were all of

the other deliveries, was made on the loading dock of the Bank Note Company. She testified that she was unable to get this entire sum when Stull asked for it and that he called her on June 3, and abused her and cursed her for her failure.

The above do not constitute all of the payments made to the defendant. Keator also testified that:

"Well, I would give him — I can't give exact sums, but I would give anywhere, when he was going out of town, on a trip, expense money, before he would leave — anywhere from $100.00 to $200.00, sometimes $300.00, before he would go on his trip; when he was travelling, he was going to play poker, and I would give him money for that."

She also testified to paying his personal bills out of company funds, including the purchase of a $200.00 air conditioner for his company automobile, and purchase of cigarette lighters for Stull's customers.

On two occasions Betty Keator spent her vacations with Stull in Wichita, and on a number of occasions she went to Wichita to be with him while he was in his territory. Large sums were spent on these occasions.

Stull admitted that he received the $3800.00 but said that he was told that it was the proceeds from a cashed insurance policy. He denied that he had received the other large sums, including the gambling money, but admitted that Keator had spent substantial amounts on his entertainment. He said that suggestions had been dropped that she had received some money from her stepfather and other money had come from a trunk of a friend of her stepfather following the death of the friend. He had never asked her specifically about the source of the funds in question. He even accused Keator of blackmailing him with threatened disclosure of his infidelity to his wife in order to continue the relationship.

The idyllic relationship between Stull and Keator built as it was on drinking, gambling, embezzlement, marital infidelity and possibly blackmail came to an abrupt end-

ing on June 9, 1956, with the arrival of the inevitable auditor. On that date Stull called Betty Keator and asked her to meet him at the office. She replied that she didn't want to go there because the auditor was there and he then replied: "Well, then, you know he is there," and added, "that is what I wanted to tell you."

Following discovery of her peculations, Betty Keator called Stull in Wichita and told him that she had lost her job as a result of the embezzling of the funds of the company. She asked Stull to return the $3800.00 so that she could make restitution and his reply was that he did not have the money; that he had invested it; that he might be able to raise some money and that he would be glad to sell her car for her in an effort to realize some funds. He also told her that she had better not say anything about him in connection with it — that it would only mean loss of his job. As of the time of this conversation Stull had the $3800.00 on deposit in one of his numerous bank accounts. His version of the conversation was that Keator asked him to keep the $3800.00 for her.— that it was her own money derived from insurance proceeds and that is why he did not come forward with it and remained silent even after it became known that Keator had been stealing company funds. It was not until some time later that Keator admitted to the bonding company that she had delivered the embezzled money to Stull with the exception of $1500.00. This latter was corroborated by the fact that there was a mortgage of $2100.00 on her car notwithstanding the large sums which she had embezzled. Keator's statements that she had delivered the various sums to Stull were corroborated by bank deposits in various Pueblo and Wichita banks which deposits coincided in time.

The following circumstances, among others, established the guilty knowledge of the defendant.

a. Exclusive possession of the $3800.00 immediately following the theft and retention of it by Stull after he acquired actual knowledge that Keator had been em-

bezzling from the company. This of itself was sufficient to prove knowledge of the money's stolen character and intent on his part to prevent the owner from again pos-. sessing it.

b. Receipt by Stull of numerous amounts, some of which were substantial, over a period of two years served to build up his knowledge so that in June 1956 (when he received the $3800.00) an innocent state of mind on his part was virtually impossible.

c. The conduct of Stull before, during and after June 1956 tended to prove guilty knowledge rather than his good faith.

(1) The deliveries of the money were surreptitious.

(2) The presence of the auditor caused Stull to be sufficiently anxious so that he called Keator to advise her of this.

(3) He refused to surrender the money afterwards, notwithstanding that he had actual knowledge.

(4) His explanations concerning his belief that the money was acquired honestly are unreasonable.

The jury was entitled to consider the above facts and circumstances and to determine whether or not the defendant had knowledge of the source of the funds and the requisite corrupt intention.

It is next to impossible to prove guilty knowledge in a case of this kind by direct evidence, and more often than not circumstantial evidence is used. As was said by the Court in *Goodfellow v. People,* 75 Colo. 243, 224 P. 1051:

"Direct proof of knowledge of theft is seldom obtainable, and there were sufficient facts and circumstances, in the instant case, together with defendant's admissions, from which the jury could find that defendant had knowledge of the theft at the time he received the car."

To the same effect is *Burnham v. People,* 104 Colo. 472, 93 P. (2d) 899, wherein it was said:

" * * * Direct proof of his knowledge that the goods had been larcenously obtained was not necessary. The facts established were clearly sufficient to justify the

jury's finding that he knew the goods were stolen. The circumstances considered, they are clearly inconsistent with any reasonable presumption of innocence."

A more complete declaration of the law bearing on use of circumstantial evidence to prove knowledge in a receiving stolen goods case is found in 45 Am. Jur. 403, 404. Here the author declares:

" * * * Guilty knowledge may be proved by direct evidence, or, since it is rarely the subject of direct and positive proof, by any surrounding facts or circumstances from which such knowledge may be inferred, including evidence of the accused's connection with or dealings in other stolen property.

\* \* \*

"Evidence of the unexplained possession of recently stolen goods by one charged with unlawfully receiving them is admissible, and is a strong circumstance to be considered with all the evidence in the case on the question of guilty knowledge. Such evidence may be sufficient to warrant a conviction where it is coupled with contradictory statements by the accused as to his possession of such property, with evasive statements and unusual manner of acquisition, with attempts at concealment and the fact that goods were being sold at less than their value, with the possession of other stolen property, and with other incriminating evidence and circumstances. * * * "

If the majority opinion establishes that the evidence will always be insufficient when the accused denies guilty knowledge it will be henceforth impossible to convict on this charge because there will be few confessions and no direct testimony that the accused had actual knowledge.

A most serious feature of the majority opinion is that it undermines the long standing rule that recent, exclusive possession of stolen property creates an inference of guilt of the offense charged (burglary, larceny or receiving stolen goods) sufficient of itself to justify

submission of the case to the jury. This principle is supported by a long line of decisions of this Court: *Van Straaten v. People*, 26 Colo. 184, 56 P. 905; *Foster v. People*, 56 Colo. 452, 139 P. 10; *Collins v. People*, 69 Colo. 343, 193 P. 634; *Windolph v. People*, 96 Colo. 285, 42 P. (2d) 197; *Lombardi v. People*, 124 Colo. 284, 236 P. (2d) 113; *Goodfellow v. People*, supra; *Sitterlee v. People*, 67 Colo. 523, 186 P. 527.

The "recent possession" rule is not varied by reason of the fact that the property is money. See *Wharton, Criminal Evidence*, Vol. 1, Sec. 204, pp. 410, 411, wherein the author declares:

"It is relevant to prove that following the commission of the crime the defendant had possession of or attempted to dispose of specific articles of property which were identified as belonging to the victim of the crime. The possession by the defendant of large sums of money or valuable property, or the spending of large sums of money, after the commission of the crime is relevant in the prosecution of a crime which is ordinarily committed for pecuniary gain or when such gain may be incidental to the crime, when there is evidence that the defendant did not have or was not likely to have such money or property prior to the time when the offense was committed. Such evidence is admissible even though it may have a tendency of prejudicing the jury, or may indicate the commission of other crimes by the defendant.

"When money is found in the possession of the defendant, it is generally held that it is unnecessary to identify the bills of money as having been the bills which had formerly been in the possession of the victim of the crime, or to trace the source of such money."

It seems to me that evidence was not only sufficient to prove guilty knowledge but that it was also sufficient to warrant the inference that Stull was an accessory to the thefts. The jury could have logically inferred that Keator was Stull's agent; that he controlled her by his personal attentions and possibly by the threat of ex-

posure. Cf. *People v. Spinnuzza,* 99 Colo. 303, 62 P. (2d) 471; *Miller v. People,* 92 Colo. 481, 488, 22 P. (2d) 626. This being so, I am persuaded that the majority result is a grave injustice to the People of the State of Colorado.

2. *The Question Whether the Court Erred in Failing to Instruct the Jury on Similar Transactions.*

In my opinion, there was no error in the court's refusal to give an instruction as to the limited scope of similar offenses prior to the giving of formal written instructions for these reasons:

a. Defendant waived this point by failing to make a timely demand for such instruction. Objections were not made to this evidence until the prosecution offered to show that defendant had opened several accounts in different banks and the amounts coincided with the amounts which Keator had said she had given defendant. The time for the objection was when the similar offenses took shape, and that was when Keator testified that she gave the several sums to Stull. All of this testimony went in without objection and thus the similar offenses were proven when the defendant, through counsel other than his present lawyers, made the request. Defendant can not assign this failure as error unless it can be said that the court is obligated to give such an instruction on its own motion. *Robinson v. People,* 114 Colo. 381, 165 P. (2d) 763; *Mow v. People,* 31 Colo. 351, 72 P. 1069; *West v. People,* 60 Colo. 488, 156 P. 137. Cf. *Thorp v. People,* 110 Colo. 7, 129 P. (2d) 296.

b. The course and conduct of the trial is peculiarly the province of the trial judge and the giving or refusal to give such an instruction should be a matter of discretion. 23 C.J.S., Criminal Law, Sec. 961, et seq. It is not good practice to hamstring the trial court by adopting rigid rules and to hold that they must always be applied regardless of circumstances. Conceivably the giving of a limiting instruction could prove prejudicial to the defendant in a case, for example, where there are numerous "similar transactions." The continuous repetition by

the trial court that such evidence tends to establish intent could adversely affect the rights of the accused. Moreover, if the trial judge takes the majority opinion seriously he will find himself giving limiting instructions on numerous other subjects. The trial court's discretion should not be so limited.

c. Neither *Jaynes v. People,* 44 Colo. 535, 99 Pac. 325, nor *Melville, Criminal Evidence,* hold the failure to so instruct to be prejudicial error. Today's decision is therefore innovation. I agree with these authorities that it is desirable practice in a proper case to give timely limiting instructions. I disagree with the majority conclusion that the failure to so instruct is invariably prejudicial error.

3. *The Question Whether the Instruction on Similar Transactions was Erroneous.*

The instruction which the majority opinion condemns is the trial court's number 12. It reads:

"You are instructed that there has been testimony introduced here which might have a tendency to show participation by the defendant in offenses other than that charged in the information. You are further instructed that the defendant is entitled to be tried on the charge contained in the information and upon no other, and you are to consider the evidence concerning the activities of this defendant prior to the acts with which he is charged in the information only so far as you deem them explanatory of the events leading up to and surrounding the acts charged in the information."

The basis for the majority holding that this instruction is erroneous is the use of the term "offenses" rather than the term "transactions." It is said that this misleads the jury by instructing that the other transactions were in law, offenses. *Johnson v. People,* 110 Colo. 283, 133 P. (2d) 789. Instruction number 12, supra, is not subject to the vice which was present in *Johnson v. People,* supra, wherein it was said:

"Whether the transactions admitted in evidence other

than the one charged were similar, and whether they showed a criminal intent in the transaction made the basis of the charge, or that the latter was a part of a scheme or plan to defraud the county, was for the jury to determine from all the surrounding facts and circumstances of the case, and it was prejudicial error for the court to tell the jury that the other transactions were offenses as a matter of law."

Here the court had invaded the province of the jury by saying that "there has been testimony submitted in this case as to separate and other offenses than the offense charged in the indictment filed herein." Thus, the trial judge in the *Johnson case* had told the jury that the other transactions and the crime charged in the information were offenses, that is, established as such. There was little left in that case for the jury to determine. The Court does not, however, there hold that use of the word "offense" in such an instruction will invariably constitute prejudicial error. No such attempt to instruct the jury to return a verdict of guilty is apparent in the present case. *Instruction 12,* supra, is very cautious in that it tells the jury that the evidence "might have a tendency to show participation of the defendant." It could not impress the jury that it was relieved of its duty to determine guilt or innocense. It would, of course, have been better had the Judge used the word "transaction," but the trial court's failure to employ it here should not void the proceedings.

The trial was carefully and painstakingly conducted, and no substantial error is apparent. The judgment should be affirmed.

Mr. Chief Justice Knauss and Mr. Justice Moore join in this dissent.