The PEOPLE of the State of Colorado, Plaintiff-Appellee,

v.

Jesus Franco GUTIERREZ, Defendant-Appellant.

No. 79SA370.

Supreme Court of Colorado, En Banc.

Jan. 19, 1981.

Rehearing Denied Feb. 9, 1981.

7. See n. 1, *supra.*

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Susan P. Mele-Serno-vitz, Asst. Atty. Gen., Denver, for plaintiff-appellee.

J. Gregory Walta, State Public Defender, Stephen E. Kapnik, Sp. Deputy State Public Defender, Denver, for defendant-appellant.

LOHR, Justice.

A jury convicted the defendant, Jesus Gutierrez, of felony menacing, section 18–3–206, C.R.S. 1973 (1978 Repl. Vol. 8), and unlawful use of an incendiary device in the commission of a felony, section 18–12–109(4), C.R.S. 1973 (1978 Repl. Vol. 8). In the second portion of the bifurcated trial, that same jury found that the defendant had been convicted of three prior felonies as charged, and he was adjudged an habitual criminal, section 16–13–101(2), C.R.S. 1973 (1978 Repl. Vol. 8) (the big habitual criminal act). Subsequently, he pled guilty to second-degree burglary, section 18–4–203, C.R.S. 1973 (now in 1978 Repl. Vol. 8).

On appeal, the defendant asserts that his convictions for felony menacing and unlawful use of an incendiary device should be reversed because evidence of offenses other than those for which he was being tried was received, and because a mistrial was denied notwithstanding allegedly prejudicial remarks by the district attorney during closing argument. The defendant also challenges the findings and sentence under the big habitual criminal act, alleging that one of the underlying convictions was not properly proved; that on its face that act violates constitutional requirements prohibiting cruel and unusual punishments and mandating equal protection of the laws; and that the big habitual criminal act is

otherwise unconstitutional as applied to this defendant. Finally, on the grounds of newly discovered evidence, the defendant claims that the trial court erred in refusing to grant a new trial on the felony menacing and incendiary device charges, and in refusing to permit him to withdraw his plea of guilty to second-degree burglary. We affirm each of the convictions as well as the habitual criminal adjudication.

The substantive counts in the information were based on several incidents which occurred in Denver during the evening of August 2 and the early morning hours of August 3, 1977.[1] Between 7:00 and 9:00 p. m., the defendant and his brother Ramon, armed with knives, sought to force their way into the home of Heriberto Lopez, the defendant's brother-in-law, and his wife Anna. Unable to gain entry, and hearing Heriberto call for his gun, they returned to their car, circled the block, and fired several shots, driving off when Heriberto fired his own gun. Later that evening the defendant returned and threw two Molotov cocktails at the adjoining duplex apartment occupied by Heriberto's brother, Juan, his wife Bertha, and their children. Juan was absent at the time. The incendiary devices broke a window and caused minor fire damage to a wall and curtain.

Sometime before 1:00 a. m., the defendant and his brother drove to the home of Albert Roybal, the father of Ramon's girlfriend. Ramon went to the door and tried to persuade Mr. Roybal to come outside. Roybal refused, and, when Ramon would not leave, Roybal obtained a knife and backed Ramon toward his truck. At this, the defendant came out of the truck, and Roybal returned to his house and attempted to call the police. Ramon and the defendant then burst through the unlocked door, and the defendant attacked Mr. Roybal with a machete or large knife, inflicting a

severe head wound. Mrs. Roybal called the police and named the defendant as her husband's assailant. The defendant was arrested at his home shortly after the incident at the Roybal residence. Mrs. Roybal was taken by the police to the scene of the arrest and there identified the defendant as her husband's attacker.

The trial of Ramon Gutierrez was severed from the defendant's trial.[2] The trial court then granted the defendant's motion to sever the assault and burglary counts (the Roybal incident) from his trial on the menacing and firebombing counts (the Lopez incidents). The latter, together with the habitual criminal counts, were tried first. The prosecution's principal witnesses were Heriberto, Anna, Juan, and Bertha Lopez. On cross-examination of the Lopezes, defense counsel elicited testimony which suggested that, because of family strife, the Lopezes had harbored hostile feelings toward the defendant before the August 2 incidents. The defendant's theory of the case was that the Lopezes had fabricated the incidents on which the charges were based.

The defendant presented an alibi defense. His witnesses testified that they had been drinking with the defendant at his home from around 11:00 a. m. on August 2 until his arrest early the next morning. According to their testimony, the defendant left the house only twice, to buy beer at a nearby liquor store, and was accompanied by an alibi witness on each occasion.

Following a lengthy *in camera* hearing and over the defendant's objection, the People called Albert and Susan Roybal and the police officer who had investigated the Roybal incident as rebuttal witnesses. After the judge properly cautioned the jury that the sole purpose for which evidence of the Roybal incident could be considered was to rebut the testimony of the defendant's wit-

1. The information charged the defendant with felony menacing, unlawful use of an incendiary device, second-degree assault, section 18-3-203, C.R.S. 1973 (1978 Repl. Vol. 8), conspiracy to commit second-degree assault, section 18-2-201, C.R.S. 1973 (1978 Repl. Vol. 8), second-degree burglary, and conviction of three previous felonies in Colorado and California. The conspiracy count was dismissed after a preliminary hearing.

2. Ramon subsequently pled guilty to the charges against him and was sentenced to imprisonment in the Colorado State Reformatory.

nesses, the Roybals told of the defendant's arrival at their home between midnight and 1:00 a. m., his uninvited entry, his attack on Mr. Roybal, and Mr. Roybal's injuries. The officer recounted the Roybals' statements identifying the defendant as the person who assaulted Mr. Roybal, confirmed the extent of Mr. Roybal's head injuries, and told of Mrs. Roybal's eyewitness identification of the defendant as her husband's assailant during the early morning hours of August 3 after being transported by the police to the scene of the defendant's arrest.

The jury convicted the defendant of the charges based on the Lopez incidents, and found the habitual criminal counts to have been established. In accordance with the mandatory provisions of the big habitual criminal act, section 16–13–101(2), C.R.S. 1973 (1978 Repl. Vol. 8), the trial court then sentenced him to life imprisonment. Thereafter, the defendant pled guilty to second-degree burglary in exchange for dismissal of the other charges arising from the Roybal incident.[3]

Several months later, but before sentencing on the burglary charge, the defendant filed motions for a new trial on the menacing, incendiary device, and habitual criminal counts and to withdraw his plea of guilty to the burglary count, all based on newly discovered evidence. That evidence consisted of the statement of a reformatory inmate that Ramon Gutierrez had confided that his "other brother," not the defendant, committed the crimes with Ramon; a statement dictated by Ramon that his brother Raul Gutierrez participated in the menacing and firebombing incidents and assaulted Albert Roybal; and Raul's affidavit that he, not the defendant, firebombed the Lopez duplex and assaulted Albert Roybal.

Ramon Gutierrez testified consistently with his written statement at an evidentiary hearing on the motions. Raul Gutierrez, who had been subpoenaed for the hearing, failed to appear; however, his affidavit was admitted into evidence. Several prosecution witnesses again identified the defendant, in court, as the person who had committed the acts charged in the information. The trial court denied the defendant's motions and sentenced him to ten to fifteen years in the Colorado State Penitentiary on the second-degree burglary count, the sentence to run concurrently with the mandatory life sentence.

## I.

The defendant contends that the admission of evidence of the Roybal incident to rebut his alibi defense was reversible error. We do not agree.

Evidence of crimes other than those for which a defendant is on trial is inadmissible if offered to prove that the accused has a character defect which makes it more probable that he committed the act in question. "Evidence of prior acts is never admissible to show the propensity of the accused to commit crimes." *People v. Honey,* Colo., 596 P.2d 751, 754, n. 2 (1979); *see Stull v. People,* 140 Colo. 278, 344 P.2d 455 (1959); C.R.E. 404(b). However, if offered for another purpose, evidence of other criminal transactions may be admissible. In such cases its admissibility depends on two factors: first, strict compliance with the procedural guidelines outlined in *Stull v. People, supra,* and, second, satisfaction of the substantive criteria enumerated in *People v. Honey, supra. Honey* provides:

"[T]he court must determine if the substantive value of the evidence merits its consideration by the jury. In this respect, the court must address three issues: (1) Is there a valid purpose for which the evidence is offered? (2) Is the evidence relevant to a material issue in the case? (3) Does the probative value of the evidence of the prior act, considering the other evidence which is relevant to

---

**3.** The charges dismissed were assault and three counts alleging convictions of prior felonies which, upon conviction of the underlying burglary and assault counts, would have resulted in the imposition of a second mandatory life sentence under section 16–13–101(2), C.R.S. 1973 (1978 Repl. Vol. 8).

the issue, outweigh the prejudice which would result from its admission?" Colo., 596 P.2d at 754.

■ There can be no question but that the first two *Honey* criteria were satisfied here. The evidence of the Roybal incident was offered to refute, counteract, or disprove the defendant's alibi evidence. That is a valid purpose. *People v. Lewis*, 180 Colo. 423, 428, 506 P.2d 125, 127 (1973); *Moore v. People*, 171 Colo. 338, 467 P.2d 50 (1970). The relevance of determining the credibility of testimony that the defendant was home all evening and therefore could not have committed the crimes as charged is apparent. The issue on which the admissibility of the description of the Roybal incident turns is whether the third *Honey* criterion, the balancing test, has been satisfied.

The defendant was tied to the Lopez incidents solely by the testimony of the victims, Heriberto, Anna, Bertha, and Juan Lopez. The defendant's wife was the sister of Heriberto and Juan Lopez. On cross-examination of the Lopezes during the People's case, it developed that they were hostile to the defendant because of family discord. This called into question the veracity of their testimony. The defendant's theory was that the Lopezes' testimony was totally fabricated—that not only was the defendant not guilty of the crimes, but that the crimes never occurred.

The defendant presented three alibi witnesses. Leonzio Gonzales testified that he had been with the defendant at the latter's home from late morning on August 2 until the defendant's arrest at his home between midnight and 1:00 a. m. on August 3, except for two joint trips to purchase beer, and that the defendant was never out of his presence during that time. Elizabeth Harrison testified that she arrived at the defendant's home shortly after 4:00 p. m. on August 2 and, except for a brief trip by each to purchase beer, she remained at that location with the defendant until the defendant was arrested after midnight on August 3. The defendant is not related to either Gonzales or Harrison. The defendant's wife corroborated the testimony of Gonzales and Harrison that the defendant was home during the times of the Lopez incidents. It was stipulated that the defendant remained in custody after his arrest until the next day.

The doubt previously created as to the truth of the Lopezes' testimony because of their hostility to the defendant made it critically important to the People to rebut the alibi evidence effectively. The evidence relied upon by the People for rebuttal was that the defendant visited the Roybals shortly after midnight on August 3, preceding his arrest. If that visit took place, the alibi witnesses could not have been telling the truth. Thus, the rebuttal testimony goes to the very heart of the alibi defense.

As developed in cross-examination of the Roybals, their acquaintance with the defendant prior to the incident in question was not extensive.[4] This increased the importance of establishing why their encounter with the defendant was memorable. Only by permitting evidence of the defendant's attack upon Mr. Roybal could the memorability of the fact and the date of the defendant's visit be fully impressed on the jury. The presentation was no more lurid than necessary to bring out the facts. Additionally, Mrs. Roybal testified that she was taken by the police to identify the defendant shortly after his arrest. That identification, almost immediately after the Roybal incident, strongly supported the accuracy of the Roybals' identification of the defendant as the person who was at their home. Testimony as to such later identification would have made little sense, even if permitted, if the story of the defendant's attack upon Mr. Roybal had not been allowed.

4. They knew Ramon because he had been dating their daughter contrary to their wishes. Mr. Roybal had beaten Ramon up at an earlier time because of the conflict about Ramon's relationship with the daughter. Mr. Roybal had seen the defendant several times. Mrs. Roybal had seen him two or three times before the incident of August 2.

The defendant contends that at a minimum the trial court should have limited the testimony about the Roybal incident to the events which preceded the defendant's entry into the house. He argues that this would have rebutted the alibi evidence and minimized the prejudicial impact of evidence of the defendant's attack on Mr. Roybal. This question must be resolved by weighing the probative value of the additional evidence, considering the other evidence relevant to the issue, against its prejudicial effect, as required by *Honey.*

A question which would occur naturally to a finder of fact is whether the Roybals might have been correct about the occurrences but mistaken about the date. In addition to emphasizing the memorability of the events, the entire story, including Mrs. Roybal's identification of the defendant at the scene of his arrest, establishes beyond question that the Roybal incident and the Lopez incidents took place on the same evening. Thus, presentation of the entire story would prevent the trier of fact from resolving the conflicting evidence on the basis of a reasonable doubt as to the accuracy of the Roybals' memory of the date.

The prejudicial effect of testimony describing the defendant's attack on Mr. Roybal is undeniable. However, in view of all relevant factors, including the strength of the defendant's alibi evidence, including as it did the testimony of two witnesses apparently unrelated to the defendant or to each other that the defendant was at home and in their presence at the critical times, and the critical importance of establishing that the Roybal incident and the Lopez incidents occurred on the same date, we conclude that the probative value of the presentation of evidence of the entire Roybal incident outweighed its prejudicial effect.[5]

*Honey* also mandates that the jury be instructed of the limited purpose of evidence of other criminal transactions at the time the evidence is received, and again in written instructions when the case is submitted to the jury. The trial court scrupulously complied with this requirement by instructing the jury on both occasions that the evidence of the Roybal incident could be used for the sole purpose of rebutting the testimony of the witnesses called by the defendant.

We conclude that the evidence of the Roybal incident was properly received.

## II.

The defendant asserts that the trial court erred in denying his motion for mistrial upon completion of the closing argument. We disagree.

The motion was based upon allegedly improper remarks by the prosecutor in his rebuttal argument. The district attorney argued in rebuttal that, in order to find the defendant not guilty, it would be necessary that the jury disbelieve all of the Lopezes and both of the Roybals and believe that the Roybals made up the story and were "so good at doing it they faked out the policemen" and that all prosecution witnesses were successful throughout the case in "fooling or convincing people who deal in these types of things all the time that the things really happened." These statements, suggesting that the prosecution and the police were persuaded that the prosecution's witnesses were credible, and that they possess expertise in evaluating credibility based on experience in such matters, were ill-advised. However, they were made during the course of a long argument with respect to the hotly contested issue of credibility of witnesses. No contemporaneous objection was made. *See Kostal v. People,* 160 Colo. 64, 414 P.2d 123 (1966). The defense counsel's closing argument was not made part of the record, so we cannot determine whether the remarks may have been justified in response to closing argument by the defense. *See People v. Becker,* 187 Colo. 344, 531 P.2d 386 (1975).

5. The trial court did not have the benefit of *Honey v. People, supra,* at the time of its ruling and so did not analyze the admissibility question in terms of the specific *Honey* criteria. However, it did carefully consider the question of admissibility with the guidance of *Stull v. People, supra.*

The granting or denial of a motion for mistrial is within the sound discretion of the trial judge. *E. g., People v. Becker, supra.* Contentions of improper argument must be evaluated in the context of the argument as a whole and in light of the evidence. *See People v. McGill,* 190 Colo. 443, 548 P.2d 600 (1976). The trial court heard the full closing argument of both sides and was in the best position to evaluate the effect of the remarks on the jury. *See People v. Becker, supra.* The court instructed the jury that the remarks are not evidence. In absence of a showing to the contrary, we presume the jury understood and followed the instructions. *See, e. g., id.* We cannot conclude that the trial court abused its discretion in denying the motion for mistrial. *See Allarid v. People,* 162 Colo. 537, 427 P.2d 696 (1967).

We have considered the defendant's other ground for mistrial and find it to be without merit.

### III.

We next consider the defendant's contentions that the habitual criminal act violates the constitutional proscription of cruel and unusual punishments and the constitutional requirement of equal protection of the laws.[6]

The mandate of a life sentence based solely upon habitual criminal status is the characteristic of the act upon which the defendant's claims of constitutional infirmity are based. His claims may be summarized as follows: (1) by denying discretion in sentencing of habitual criminals while permitting varying degrees of discretion in sentencing other convicted persons, the legislature has denied habitual criminals the equal protection of the laws; (2) denial of discretion to the trial judge to consider and give effect to mitigating factors in selecting a sentence, coupled with the severity of the mandated life sentence, constitute cruel and unusual punishment; and (3) the big

habitual criminal act is unconstitutional as applied to this defendant because not all of the felony convictions upon which his habitual criminal status is based are for violent crimes.

Constitutional attacks upon habitual criminal statutes are not new and have been generally unsuccessful. As the United States Supreme Court said in *Spencer v. Texas,* 385 U.S. 554, 559, 87 S.Ct. 648, 651, 17 L.Ed.2d 606, 611 (1967):

"[Habitual criminal] statutes and other enhanced-sentence laws, and procedures designed to implement their underlying policies, have been enacted in all the States, and by the Federal Government as well. See, *e. g.,* 18 U.S.C. § 2114; Fed.Rule Crim.Proc. 32(c)(2); D.C. Code § 22–104 (1961). Such statutes, though not in the precise procedural circumstances here involved, have been sustained in this Court on several occasions against contentions that they violate constitutional strictures dealing with double jeopardy, *ex post facto* laws, cruel and unusual punishment, due process, equal protection, and privileges and immunities. *Moore v. Missouri,* 159 U.S. 673 [16 S.Ct. 179, 40 L.Ed. 301]; *McDonald v. Massachusetts,* 180 U.S. 311 [21 S.Ct. 389, 45 L.Ed. 542]; *Graham v. West Virginia,* 224 U.S. 616 [32 S.Ct. 583, 56 L.Ed. 917]; *Gryger v. Burke,* 334 U.S. 728 [68 S.Ct. 1256, 92 L.Ed. 1683]; *Oyler v. Boles,* 368 U.S. 448 [82 S.Ct. 501, 7 L.Ed.2d 446]."

We have previously upheld the big habitual criminal act in the face of attacks founded upon constitutional provisions with respect to equal protection and cruel and unusual punishments. *People v. Bergstrom,* 190 Colo. 105, 544 P.2d 396 (1975); *cf. People v. Marguez,* 190 Colo. 255, 546 P.2d 482 (1976) (involving the "little habitual criminal act," section 16–13–101(1), C.R.S. 1973 (now in 1978 Repl.Vol.8), which mandated an enhanced sentence within a pre-

---

**6.** *See U. S. Const.* amend. VIII, which is applicable to the states pursuant to the due process clause of *U. S. Const.* amend. XIV; *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); *Colo. Const.* Art. II, § 20; *Colo. Const.* Art. II, § 25. (The due process clause of *Colo. Const.* Art. II, § 25, includes the right to equal protection of the laws. *See, e. g., Heninger v. Charnes,* Colo., 613 P.2d 884 (1980).)

scribed range when *two* prior felony convictions had been charged and established); *People v. Thomas,* 189 Colo. 490, 542 P.2d 387 (1975) (also involving the "little habitual criminal act"). The gravamen of the attacks upon the facial constitutionality of the statutes in *Bergstrom* and *Thomas* was discriminatory enforcement. Because the nature of the constitutional challenges is different here, we shall address the defendant's arguments specifically.

■ Our analysis begins with the familiar principles that a statute is presumed to be constitutional, *e. g., People v. Edmonds,* 195 Colo. 358, 578 P.2d 655 (1978); *Howe v. People,* 178 Colo. 248, 496 P.2d 1040 (1972), and that a defendant has the burden of establishing the unconstitutionality of a statute, as applied, beyond a reasonable doubt, *e. g., People v. Albo,* 195 Colo. 102, 575 P.2d 427 (1978); *People v. Gonzales,* 188 Colo. 272, 534 P.2d 626 (1975).

### A.

We must determine whether in prescribing a specific inflexible sentence to life imprisonment for persons found to be habitual criminals on the basis of three prior felony convictions, while allowing various degrees of flexibility in sentencing other offenders, the legislature has denied such habitual criminals the equal protection of the laws.

■ In *People v. Childs, Jr.,* Colo., 610 P.2d 101, 102 (1980), we said:

"The right to equal protection of the law guarantees only that all parties who are similarly situated receive like treatment by the law. Where the general assembly has made a distinction between different classes of people, that distinction will be upheld provided it is neither arbitrary nor unreasonable. *People v. Calvaresi,* 188 Colo. 277, 534 P.2d 316 (1975). Only in those cases where the challenged statute singles out individuals in a suspect class, such as race, or involves the exercise of a fundamental right, will this Court require more than a rational basis to support the legislative classification. [Citations omitted.]"

Under the big habitual criminal act, persons who are found guilty of a felony and who are also found to have three prior felony convictions are singled out for more severe sentences than convicted persons who have fewer prior felonies on their records. The legislature has created a scale. Persons with only one prior felony conviction are not habitual criminals and generally[7] are not subject to enhanced sentences on the basis of the single prior felony. A second prior felony conviction, however, brings into play the little habitual criminal statute and renders a defendant vulnerable to an enhanced sentence to imprisonment in the range from 25 to 50 years.[8] A third prior felony conviction renders a defendant vulnerable to a finding of habitual criminal status under the big habitual criminal act, which mandates a life sentence.

This statutory scheme reflects progressively increasing penalties for a person who evidences an unwillingness or inability to reform and poses an attendant risk to society. Only when an accused has been convicted of three prior felonies and is convicted of a fourth is the trial judge deprived of discretion in sentencing. We conclude that the statutory scheme has a rational basis. *See People v. Childs, Jr., supra* (involving an equal protection attack on the mandatory sentencing for crime of violence statute, section 16–11–309, C.R.S. 1973 (now in 1978 Repl.Vol. 8));[9] *People v. Marquez, supra;*

---

7. Special sentencing statutes create exceptions to the general rule. *See* section 12–22–412, C.R.S. 1973 (1978 Repl.Vol. 5) (1979 Supp.) (dangerous drug offenses).

8. Since 1979 the new charge must involve a maximum prescribed penalty in excess of five years to serve as a predicate for habitual offender status. Section 16–13–101, C.R.S. 1973 (1978 Repl.Vol. 8) (1979 Supp.).

9. *People v. Childs, Jr.* also lays to rest the argument implicit in the defendant's brief that mandatory sentencing infringes a constitutional requirement of separation of judicial and legislative powers. There we held that adoption of mandatory sentencing for a crime of violence is within the inherent authority of the legislature.

*People v. Bergstrom, supra; People v. Thomas, supra; Vigil v. People,* 137 Colo. 161, 322 P.2d 320 (1958).

## B.

■ The defendant would have us conclude that the big habitual criminal act is invalid on its face as prescribing cruel and unusual punishment. The basis of this position is that the requirement of a mandated life sentence, absent discretion in the trial judge to impose a lesser sentence upon a showing of mitigating circumstances, constitutes cruel and unusual punishment. This contention is untenable under *U.S. Const.* amend. VIII. In *Spencer v. Texas, supra,* and *Rummel v. Estelle, Jr.,* 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), the United States Supreme Court upheld the constitutionality of a Texas habitual criminal statute which requires imposition of a sentence to life imprisonment upon the third conviction of a non-capital felony. *Accord, e. g., Graham v. West Virginia,* 224 U.S. 616, 32 S.Ct. 583, 56 L.Ed. 917 (1912); *Moore v. Missouri,* 159 U.S. 673, 16 S.Ct. 179, 40 L.Ed. 301 (1895). Although absence of sentencing discretion was not the basis of the cruel-and-unusual-punishment attack on the Texas statute in *Spencer* and *Rummel,* the broad language of approval of habitual criminal statutes as consistent with the Eighth Amendment's prohibition of cruel and unusual punishments, and the long history of judicial rejection of attacks upon such statutes as violative of that prohibition, leave no doubt that the mandatory sentencing provision of Colorado's big habitual criminal act is not invalid on its face as contrary to the requirements of the Eighth Amendment.

If the defendant's claim is to succeed, it must be on the basis that *Colo.Const.* Art. II, § 20, offers greater protection under its proscription of cruel and unusual punishments than does *U.S. Const.* amend. VIII. We are asked to look to recent United States Supreme Court cases considering the validity of death penalty statutes for guidance.

■ The Eighth and Fourteenth Amendments to the United States Constitution require that consideration be given to evidence of mitigating factors in determining whether a death sentence is to be imposed for commission of a crime. *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *People v. District Court,* 196 Colo. 401, 586 P.2d 31 (1978). Those cases are based on the predicate that the death penalty differs qualitatively from any other sentence in its severity and irrevocability. *Lockett v. Ohio, supra; People v. District Court, supra.* They have not been applied by the United States Supreme Court or by this court in any other contexts. More particularly, notwithstanding the long history of challenges to habitual criminal statutes in the United States Supreme Court and here, such a requirement has never been adopted or suggested previously. We are persuaded that the uniquely grave nature of the death penalty is the wellspring from which flows the constitutional requirement that mitigating factors be considered in sentencing notwithstanding the number or seriousness of a defendant's prior offenses. We reject the suggestion that such a requirement is included within the Colorado Constitution's prohibition of cruel and unusual punishments as applied to the sentencing of habitual criminals.

A person who has been thrice convicted of a felony has demonstrated by his repeated criminal actions that he is unable or unwilling to abide by those limitations on conduct which the legislature has found necessary or appropriate to the functioning of a civilized society. The legislature has determined that such a person, when thereafter convicted of an additional felony, must be isolated from society by a sentence of life imprisonment without regard to mitigating circumstances. We cannot conclude from the face of the statute that the mandated punishment is disproportionate to the conduct on which it is based. Compare this case with *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (death penalty for rape of adult woman is cruel and unusual punishment), and *Weems v. United States,* 217 U.S. 349, 30 S.Ct. 544, 54

L.Ed. 793 (1910) (punishment of "cadena temporal" whereby a prisoner is confined for twelve to twenty years in chains and at hard and painful labor is cruel and unusual punishment for the offense of falsifying a public document). *See generally Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). We conclude that the absence of sentencing discretion, even when coupled with a prescribed life sentence, does not render the statute facially invalid as violative of the prohibition of cruel and unusual punishments in *Colo. Const.* Art. II, § 20. *See People v. Childs, Jr., supra; People v. Marquez, supra; People v. Bergstrom, supra; People v. Thomas, supra.*

### C.

The defendant's final constitutional challenge is that Colorado's habitual criminal statute is unconstitutional as applied to him. Specifically, he contends that use of a nonviolent felony offense as a basis of an adjudication of habitual criminality which in turn is used to support a mandatory life sentence constitutes cruel and unusual punishment. We disagree.

 The attack upon the Texas statute in *Rummel v. Estelle, Jr., supra*, was based upon the contention that the statute was unconstitutional as applied. There, the defendant contended that his statutorily prescribed sentence to life imprisonment under the Texas habitual offender act was disproportionately severe in relation to the underlying crimes and that the Eighth Amendment requires proportionality. Rejecting the challenge, the majority of that court held that, at least in absence of a most extreme application, the Eighth Amendment's proscription of cruel and unusual punishments is not violated by a recidivist statute mandating a life sentence upon conviction of a third felony.[10]

10. The majority recognized that a proportionality principle could come into play in an extreme situation such as a statutorily sanctioned sentence to life imprisonment for overtime parking. *See id.*, 445 U.S. at 274, n. 11, 100 S.Ct. at 1139, 63 L.Ed.2d at 391. In *Rummel* the three

The defendant asserts that nonviolent felony offenses cannot constitutionally serve as predicates for a life sentence as an habitual criminal. He cites no authority for that proposition and we have found none. Rather, "the presence or absence of violence does not always affect the strength of society's interest in deterring a particular crime or in punishing a particular criminal." *Rummel v. Estelle, Jr., supra* 445 U.S. at 275, 100 S.Ct. at 1140, 63 L.Ed.2d at 392. Whether there might be circumstances in which a mandatory life sentence would constitute cruel and unusual punishment because the crimes supporting habitual criminal status taken together with the substantive crimes giving rise to the habitual criminal determination are so minor in nature as to constitute cruel and unusual punishment, we need not decide today. *See* Chief Justice Pringle's dissent in *People v. Bergstrom, supra.* The defendant's situation presents no case for application of any such limitation. His underlying felony convictions are for robbery with use of a knife, conspiracy to commit burglary of a convenience store, and taking a vehicle without the owner's consent. The offenses which triggered the habitual criminal charges involved assault with the use of a knife, and unlawful use of an incendiary device. The latter offense was committed by throwing a Molotov cocktail at an apartment housing a woman and her young children despite entreaties by the woman not to harm her and her family. The dangerous activities reflected in this record provide no foundation for an argument that life imprisonment is cruel and unusual punishment as applied to this defendant. *See People v. Bergstrom, supra.*

### IV.

We also must consider certain objections to the admissibility of a document used to prove a prior conviction of the defendant in California.

felony offenses upon which sentencing as an habitual criminal was based were nonviolent property offenses involving a total of $229.11 wrongfully taken. Compare *Rummel v. Estelle, Jr., supra*, with *Coker v. Georgia, supra*, and *Weems v. United States, supra.*

## A.

The defendant contends that Exhibit J, a copy of certain of the defendant's California prison records, was not properly received in evidence because it was not duly authenticated pursuant to section 16–13–102, C.R.S. 1973 (1978 Repl. Vol. 8). Exhibit J is an essential link connecting the defendant to the properly proved California conviction.

The relevant documents constituting part of Exhibit J were certified to be true and correct by the assistant chief records administrator of the California Department of Corrections, under the seal of that Department. That same certificate states that the director of the California Department of Corrections is the official legal custodian of the records of prisoners committed to the California state prisons and that the director has authorized the assistant chief records administrator to certify such records on the director's behalf. In support of that certification, the assistant chief records administrator attested to a copy of a document reflecting the director's signed authorization to the assistant chief records administrator to certify such criminal records on behalf of the director. Finally, the secretary of state of the state of California, through a deputy and under the great seal of that state, certified to the identity of the director at the relevant time, that the director holds a public office not appertaining to a court, that such official is keeper of the books and records of the Department of Corrections, that the attestation of the director by the assistant chief records administrator is in due form, and that the latter officer is the proper officer to make the attestation.

Although there is no certificate as to the identity and authority of the deputy secretary of state, see *Coppinger v. People*, 152 Colo. 9, 380 P.2d 19 (1963); *DeGesualdo v. People*, 147 Colo. 426, 364 P.2d 374 (1961), we conclude that the presence of California's great seal supplies the requisite authenticity. *Cf.* C.R.C.P. 44(a)(1). This combination of certificates was adequate to satisfy the "duly authenticated" require-

ment of the statute. *See Brown v. People*, 124 Colo. 412, 238 P.2d 847 (1951); *see also Silva v. People*, 170 Colo. 152, 459 P.2d 285 (1969).

## B.

The defendant also objects to the admission of his California prison records because they reflect that his conviction was obtained without representation by counsel and it has not been established that waiver of counsel was constitutionally valid. A defendant may not be subjected to greater punishment based upon a conviction obtained against him when he was not represented by counsel and had not waived that right validly. *Burgett v. Texas*, 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967). Here, the abstract of judgment which is part of the prison records notes that the California conviction was based on a plea of guilty, "Counsel waived." We have held that a defendant must make a prima facie showing that a prior conviction is constitutionally invalid in order to bar the use of that conviction in a later proceeding. *People v. Roybal*, Colo., 618 P.2d 1121 (1980) (use to establish habitual traffic offender status); *People v. Roybal*, Colo., 617 P.2d 800 (1980) (use to establish habitual traffic offender status); *see People v. Meyers*, Colo., 617 P.2d 808 (1980) (use for impeachment); *People v. Morrison*, 196 Colo. 319, 583 P.2d 924 (1978) (use for impeachment); *People v. Woll*, 178 Colo. 443, 498 P.2d 935 (1972) (use for impeachment).

Here, the defendant offered no evidence whatsoever that the waiver of right to counsel was not constitutionally effective. Although waiver of the right to counsel may not be presumed from a silent record, *Burgett v. Texas, supra,* we conclude that, when the record affirmatively reflects such waiver, the defendant must make a prima facie showing that the waiver was ineffective before the People must introduce additional evidence to prove the validity of the waiver. *See* each of the two *Roybal* cases, *supra; People v. Morrison, supra; People v. Woll, supra.* In absence of such a showing we will not question the

constitutional validity of the waiver of counsel reflected by the California record.

### V.

We turn now to the defendant's contention that the trial court abused its discretion by denying his motions to withdraw his guilty plea to the charge of second-degree burglary, and for new trial on the felony menacing and incendiary device charges. These motions were based on allegedly newly discovered evidence.

### A.

▇▇▇ To warrant a change of plea before entry of a sentence, there must be some showing that denial of the request will subvert justice. *Maes v. People*, 155 Colo. 570, 396 P.2d 457 (1964). The burden of demonstrating a "fair and just reason" for the change rests on the defendant. *People v. Martinez*, 188 Colo. 169, 533 P.2d 926 (1975); *see also* 3 *A.B.A. Standards for Criminal Justice, Pleas of Guilty* 14–2.1(a) (2d Ed. 1980). Whether such a showing was made is a matter within the discretion of the trial court. We intervene only if the court has abused its discretion. *Maes v. People, supra; see People v. Riley*, 187 Colo. 262, 529 P.2d 1312 (1975); *Lucero v. People*, 164 Colo. 247, 434 P.2d 128 (1967).

Here the defendant contends that the circumstances in which the plea was entered (the risk that he would again be adjudged an habitual criminal and sentenced to a second mandatory life term), the newly discovered evidence, and the "confession" by Raul Gutierrez to the burglary and assault committed at the Roybal residence warranted withdrawal of the plea. We disagree.

▇▇▇ First, the defendant's plea was accepted after an exhaustive providency hearing. While it does not appear that the defendant affirmatively confessed his guilt of the offense charged, the hearing fully complied with the provisions of Crim.P.

11(b). Therefore, the guilty plea was properly accepted and may not now be attacked as involuntary or unintelligent. *See People v. Martinez, supra; North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

▇▇▇ Second, the denial of the defendant's motion to change the plea was prefaced by a full-sale hearing canvassing the newly discovered evidence he cited as the justification for its withdrawal. The trial court admitted the testimony of Ramon Gutierrez and the affidavit of Raul Gutierrez.[11] Prosecution witnesses who again positively identified the defendant as the wrongdoer were cross-examined by defense counsel. The judge who presided over the hearing had heard the defendant's alibi witnesses testify about his whereabouts during the Roybal incident at the defendant's earlier trial on the menacing and incendiary device charges. Based upon our review of the record and examination of the newly discovered evidence presented at the hearing, we cannot say that the trial court's conclusion that no fair and just reason existed for withdrawal of the defendant's plea was an abuse of its discretion. *See* 3 *A.B.A. Standards for Criminal Justice, Pleas of Guilty, supra.*

### B.

The defendant's motion for new trial was also properly denied.

▇▇▇ Motions for new trial based on newly discovered evidence are not looked on with favor, and a denial of such a motion will not be overturned absent a showing of clear abuse of discretion. *People v. Scheidt*, 187 Colo. 20, 528 P.2d 232 (1974); *Digiallonardo v. People*, 175 Colo. 560, 488 P.2d 1109 (1971).

As we said in *People v. Scheidt, supra* :
"To succeed on a motion for a new trial on this ground, the defendant should show that the evidence was discovered

---

**11.** While the defendant characterizes Ramon Gutierrez' testimony as extrinsic corroboration of Raul Gutierrez' "confession," we note that there are substantial discrepancies between the two accounts. *Cf. Cheatwood v. People*, 164 Colo. 334, 435 P.2d 402 (1968) (granting a new trial based on newly discovered evidence, under very different circumstances).

after the trial; that defendant and his counsel exercised diligence to discover all possible evidence favorable to the defendant prior to and during the trial; that the newly discovered evidence is material to the issues involved, and not merely cumulative or impeaching; and that on retrial the newly discovered evidence would probably produce an acquittal. *Digiallonardo, supra.* In *DeLuzio v. People*, 177 Colo. 389, 494 P.2d 589 (1972) and *Cheatwood v. People*, 164 Colo. 334, 435 P.2d 402 (1967), it is stressed that the newly discovered evidence must be of such a character as to probably bring about an acquittal verdict if presented at another trial."

187 Colo. 20, 22, 528 P.2d 232, 233.

 In considering the defendant's motion for new trial, the trial court reviewed the same evidence previously referred to in the discussion of the defendant's motion to withdraw his plea of guilty to second-degree burglary. The court noted that the statements of Ramon and Raul were inconsistent in a number of respects. *See People v. Scheidt, supra.* The trial court had heard the evidence at the trial. Based on review of all the available evidence, the trial court specifically found that the allegedly newly discovered evidence would not probably produce an acquittal. The evidence supports that finding. The defendant failed to make the essential showing that the new evidence would probably produce an acquittal on retrial. Accordingly, his motion for new trial was properly denied. *People v. Scheidt, supra; People v. Digiallonardo, supra.*[12]

The judgments of the trial court are affirmed.

DUBOFSKY and QUINN, JJ., dissent.

DUBOFSKY, Justice, dissenting:

I respectfully dissent from part I of the majority opinion and therefore find it unnecessary to reach the issues considered in parts II, III, and IV. I concur in part V of the opinion.

I take issue with the majority's application of the balancing test set forth as the third criterion in *People v. Honey*, Colo., 596 P.2d 751 (1979). Because I conclude that the admission of the Roybal testimony was more prejudicial than probative, I would reverse the defendant's conviction of felony menacing and unlawful use of an incendiary device in the commission of a felony.

The Roybal testimony as presented in rebuttal had two aspects: (1) the testimony that the defendant and his brother appeared at the Roybal home sometime between midnight and 1:00 a. m. on August 3, and (2) the testimony implicating the defendant in the assault on Mr. Roybal. There is no question that the former was relevant to the Lopezes' veracity. By contradicting an element of the alibi testimony about which the defendant's witnesses would not have been mistaken had they been telling the truth, this testimony "pulled the linchpin" of the alibi and indirectly corroborated the Lopezes' accusations. *See McCormick, Evidence* (2d Ed. 1972) § 47. The defendant did not challenge the admissibility of the neutral testimony on appeal, and it was proper rebuttal.

A more difficult issue is raised by the testimony implicating the defendant in the assault on Mr. Roybal. The testimony was relevant to the Lopezes' veracity, *People v. Honey, supra*, but notwithstanding its relevance, its probative value, considering the other evidence which was relevant to the

12. The new evidence included statements of Ramon Gutierrez that the defendant lent his car to Raul and Ramon Gutierrez shortly before the occurrence of the Lopez incidents. Raul's statement is consistent in that respect. If true, this information was available to the defendant prior to trial and would have given him reason to suspect then that Raul was the party who had participated with Ramon in the Lopez incidents. Evidence within the defendant's knowledge prior to trial does not constitute newly discovered evidence. *People v. Gallegos*, 187 Colo. 6, 528 P.2d 229 (1974). The fact that Ramon's testimony was not available to the defendant at trial because Ramon was unwilling to testify prior to his own trial does not make his testimony newly discovered. *See People v. Fletcher*, 193 Colo. 314, 566 P.2d 345 (1977). Thus, although the trial court did not rely on this ground, there is a substantial basis to conclude that the evidence would have been available on exercise of diligence prior to trial.

issue, must outweigh the prejudice which would result from its admission. *Id.*, Colo., 596 P.2d at 754. Although the trial judge is allowed wide discretion when he weighs these matters, *People v. Ihme*, 187 Colo. 48, 528 P.2d 380 (1974), my review of the record leads to the conclusion that the trial judge should not have admitted the evidence describing the assault on Mr. Roybal. The Lopezes' testimony was believable. The evidence of their animus toward the defendant did not inexorably lead to the conclusion that they had concocted their accusations to "get" him. Defendant's alibi witnesses, while not unworthy of belief, were cross-examined thoroughly and could easily have been disbelieved. Considering this evidence together with the rebuttal value of the Roybals' non-prejudicial testimony that the defendant and his brother appeared at their door before 1:00 a. m. on August 3, I conclude that despite the limiting instructions given to the jury, the prejudicial impact of the Roybals' graphic account of the defendant's assault on Mr. Roybal and the evidence of the subsequent police investigation exceeded its value as proof of the Roybals' credibility and, indirectly, of the Lopezes' veracity.

Under any circumstances, evidence of other crimes suggests to the jury that the accused "is a depraved person who likely would commit the crime for which he is being tried." *Stull v. People*, 140 Colo. 278, 284, 344 P.2d 455, 458 (1959). In certain cases the risk that the accused will be convicted by "damning innuendo," *id.*, is countenanced because the evidence is not only highly probative of but "necessary" to prove some other fact material to his guilt or innocence. *People v. Honey, supra,* Colo., 596 P.2d at 754. In other cases, however, the risk is too grave to be tolerated. I believe that this is one such case.

Not only was the account of the assault on Mr. Roybal unnecessary[1] to impeach the defendant's alibi, but, equally significantly, its prejudicial tendency to convict the defendant of one crime by proof that he was guilty of another was aggravated by close parallels between the Lopez and Roybal incidents.[2] Both involved knife-wielding assaults on persons with whom the defendant or his brother Ramon had recently and heatedly quarreled over family matters. Ramon actively participated in both incidents. Both occurred within several hours of one another. Under these circumstances, the testimony describing the assault on Mr. Roybal and identifying the defendant as his assailant overwhelmingly suggested that defendant and his brother had embarked on a violent, night-long vendetta against their in-laws[3]—a vendetta which began with the attempted assault on Heriberto Lopez and the firebombing of the Lopezes' duplex and culminated in the attack on Albert Roybal. Yet it is precisely this all too natural inference—that, on the night in question, the defendant possessed a marked propensity to engage in family related violence—that cannot be tolerated under our system of criminal justice.

Admission of other crimes is reversible error when, although relevant to prove the material issue for which it is offered, its probative value, considering the other evidence relevant to that issue, is outweighed by its prejudicial tendency to convict a defendant of one offense by proof that he is guilty of another. *See People v. Honey, supra; People v. Lucero,* Colo., 615 P.2d 660 (1980). I therefore dissent.

I am authorized to say that Justice QUINN joins me in this dissent.

---

1. Had evidence describing the assault or the entry upon the Roybal residence been the *only* rebuttal evidence at the prosecution's disposal, its probative value would have exceeded its prejudicial impact.

2. The charges underlying the Lopez and Roybal incidents were severed to avoid this problem.

3. Ramon's relationship with the Roybals' daughter is not clearly established by the record. At one point the record suggests that they were common-law spouses; at another they are described as boyfriend and girlfriend.