22CA1320 Peo v Samuels 07-25-2024 COLORADO COURT OF APPEALS Court of Appeals No. 22CA1320 Arapahoe County District Court No. 05CR926 Honorable Darren L. Vahle, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Ricardo Lemar Samuels, Defendant-Appellant. ORDER AFFIRMED Division VI Opinion by JUDGE LIPINSKY Freyre and Schutz, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced July 25, 2024 Philip J. Weiser, Attorney General, Jacob R. Lofgren, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee Victor T. Owens, Alternate Defense Counsel, Parker, Colorado, for Defendant-
Appellant 
1 ¶ 1 Ricardo Lemar Samuels appeals the postconviction court’s order denying his Crim. P. 35(c) claim that newly discovered evidence warrants a new trial. We affirm. I. Background A. The Charges, Trial, and Direct Appeal ¶ 2 In 2005, Samuels was charged with first degree murder, among other crimes, for his role in a drive-by shooting that resulted in the death of one of the three victims. The evidence at Samuels’s trial showed that Samuels (who was referred to by the nickname “Smoke”) was the shooter and that Cameron Davis was driving the car from which Samuels fired the gunshots. ¶ 3 Davis did not testify at Samuels’s trial. He was tried separately after Samuels’s trial. ¶ 4 Samuels’s theory of defense was that an alternate suspect, Q.W., was the shooter. ¶ 5 The jury found Samuels guilty of one count of first degree murder, two counts of attempted first degree murder, one count of conspiracy to commit first degree murder, one count of possession of a weapon by a previous offender, and two crime of violence 
2 counts. The trial court sentenced him to life plus 150 years in the custody of the Department of Corrections. ¶ 6 On direct appeal, a division of this court affirmed the judgment of conviction. See People v. Samuels, 228 P.3d 229 (Colo. App. 2009). ¶ 7 Davis testified at his separate trial for first degree murder and other charges. See Davis v. People, 2013 CO 57, ¶ 4, 310 P.3d 58, 59; People v. Davis, 312 P.3d 193, 194-95 (Colo. App. 2010), aff’d, 2023 CO 57, 310 P.3d 58. Davis admitted that he drove the car from which “Smoke” shot the victims, but he claimed he did not know in advance that “Smoke” was going to shoot anyone. Davis, ¶ 4, 310 P.3d at 59. The jury found Davis guilty of the lesser included offense of reckless manslaughter, as well as accessory to a crime and reckless endangerment. Id. at ¶ 10, 310 P.3d at 60. B. The Postconviction Filings and Initial Rulings ¶ 8 In 2014, Samuels filed a pro se Crim. P. 35(c) motion for postconviction relief that raised numerous issues not germane to this appeal. ¶ 9 The postconviction court summarily denied as time barred several of Samuels’s claims in the Crim. P. 35(c) motion and 
3 appointed counsel to represent Samuels for purposes of his remaining postconviction claims. ¶ 10 In 2021 — fifteen years after Samuels’s trial — Samuels’s postconviction counsel filed a supplemental Crim. P. 35(c) motion that raised two claims. First, postconviction counsel raised an ineffective assistance claim regarding trial counsel’s performance during voir dire. The second claim addressed newly discovered evidence. ¶ 11 Postconviction counsel based the newly discovered evidence claim on Davis’s alleged recantation of his trial testimony that Samuels was the shooter. According to the Crim. P. 35(c) motion, Davis, who had finished serving his sentence for his participation in the drive-by shooting, wanted “to set the record straight that [Q.W.] was the shooter, not Samuels.” In the motion, postconviction counsel explained that Davis had originally testified that Samuels was the shooter “to conform to his trial counsel’s advice to ensure less than a life sentence for his part in the drive-by given that his trial came after Samuel[s]’s.” The motion continued, “[Davis] didn’t want to do something that would jeopardize his ability to get the 
4 best possible result in his own case. Now that he knows he can’t be put away for life, he’s ready to tell the truth.” ¶ 12 The postconviction court granted a hearing on Samuels’s newly discovered evidence claim, but summarily denied the other claims in Samuels’s original pro se Crim. P. 35(c) motion and the supplemental motion. In addressing the newly discovered evidence claim, the court noted that Samuels “faces a steep climb in attempting to gain a new trial based on new, inconsistent statements of a co-defendant. This is especially true 15 years after the conviction.” In addition, the court alerted the parties that, if Samuels’s counsel intended to call Davis as a witness at the evidentiary hearing on the Crim. P. 35(c) motion, “the court must appoint counsel to advise [Davis] of the possible perjury charges that may be involved when he has made diametrically opposed statements in court and on the record.” C. The Postconviction Hearing and Ruling at Issue ¶ 13 At the evidentiary hearing on Samuels’s newly discovered evidence claim, the postconviction court asked Davis’s appointed counsel whether she had informed Davis that he could be charged with perjury if he gave testimony at the hearing that contradicted 
5 his testimony at his trial. Davis’s counsel responded that she had discussed the issue with Davis. She said, “[I]t is my client’s position that he would be asserting his Fifth Amendment right to remain silent regarding any questions related to differing statements about who the shooter had been.” ¶ 14 Nonetheless, Samuels’s counsel called Davis, who was under subpoena, to testify at the hearing. But because Davis had invoked his privilege against self-incrimination, he only provided testimony that did not incriminate him: that he was Samuels’s codefendant in this case, he was convicted of reckless manslaughter in 2006, he completed serving the parole component of his sentence on that conviction in 2017 or 2018, and in 2021 he met with Samuels’s defense lawyer’s investigator. ¶ 15 Because Davis had invoked his privilege against self-incrimination, the court agreed with the defense that Davis was “unavailable” for purposes of CRE 804, which sets forth the hearsay exceptions that may be invoked when the declarant is unavailable. See CRE 804(a)(1). ¶ 16 Samuels’s counsel then called the investigator, who had met with Davis in August 2021, to testify. Among other questions, 
6 Samuels’s counsel asked the investigator what Davis had told her about Samuels’s involvement in the shooting. The prosecutor immediately objected on hearsay grounds. In response, Samuels’s counsel argued that Davis’s hearsay statements to the investigator were admissible as statements against interest under CRE 804(b)(3). ¶ 17 After hearing further argument, the court sustained the hearsay objection on the grounds that Davis’s statements to the investigator did not qualify as statements against interest under CRE 804(b)(3). The court concluded that (1) because Davis wasn’t willing to testify at the Crim. P. 35(c) hearing, there was an insufficient indication that he would be charged with perjury based on his statements to the defense investigator; and (2) the circumstances indicated that Davis’s statements to the investigator were not trustworthy. ¶ 18 Following the court’s evidentiary ruling, neither party had further questions for the defense investigator. But to complete the record, the court admitted into evidence the investigator’s written report describing Davis’s hearsay statements to her. 
7 ¶ 19 At the conclusion of the hearing, the court denied Samuels’s newly discovered evidence claim in a ruling from the bench. First, the court held that Davis’s new statements would not be admissible at a retrial of Samuels because (1) Davis would invoke his privilege against self-incrimination at the new trial and (2) the defense investigator’s testimony about Davis’s statements to her was inadmissible hearsay. Therefore, Samuels had not presented any admissible evidence in support of his newly discovered evidence claim. Second, the court held that, even if Davis’s new statements could be admitted at a retrial through the investigator’s testimony, they would not be of sufficient consequence to lead a jury to acquit Samuels. II. Abandoned Claims ¶ 20 On appeal, Samuels does not challenge the postconviction court’s denial of any of his postconviction claims other than his newly discovered evidence claim. He also does not appeal the court’s ruling that his postconviction claims pertaining to his non-class 1 felony convictions were time barred. We therefore deem those claims to be abandoned. See People v. Osorio, 170 P.3d 796, 801 (Colo. App. 2007) (holding that a defendant effectively 
8 abandons a postconviction claim raised in the district court but not specifically reasserted on appeal). III. Newly Discovered Evidence Claim A. Standard of Review ¶ 21 In a Crim. P. 35(c) proceeding, a presumption of validity attaches to a judgment of conviction, and the defendant, as the moving party, bears the burden to establish his claim by a preponderance of the evidence. People v. Corson, 2016 CO 33, ¶ 25, 379 P.3d 288, 293. ¶ 22 In reviewing the denial of a Crim. P. 35(c) motion following an evidentiary hearing, we review the postconviction court’s legal conclusions de novo but defer to its factual findings if they are supported by the record. People v. Smith, 2024 CO 3, ¶ 16, 541 P.3d 1191, 1195; Corson, ¶ 25, 379 P.3d at 293-94. ¶ 23 Although the People cite these legal principles, they also cite People v. Huggins, 2019 COA 116, ¶ 28, 463 P.3d 294, 299, for the proposition that we should review the denial of a Crim. P. 35(c) motion following a hearing for an abuse of discretion. Although neither Huggins nor the case it cited for this proposition, People v. Firth, 205 P.3d 445, 449 (Colo. App. 2008) (Gabriel, J.), has been 
9 overruled, both are inconsistent with the standard of review the supreme court articulated in Smith and Corson. We apply the Smith/Corson standard of review because we are not free to depart from supreme court precedent. People v. Robson, 80 P.3d 912, 914 (Colo. App. 2003). ¶ 24 Similarly, the People cite People v. Gee, 2015 COA 151, ¶ 72, 371 P.3d 714, 725, for the proposition that we apply the abuse of discretion standard when reviewing a ruling on a motion for a new trial based on newly discovered evidence. However, that case involved a Crim. P. 33(c) motion, and not a Crim. P. 35(c) motion. See Gee, ¶ 15, 371 P.3d at 719. To the extent that Gee is inconsistent with supreme court cases such as Smith, we follow the latter for the reasons noted above. See also People v. Lopez, 2015 COA 45, ¶ 65, 399 P.3d 129, 139 (noting that we do not review a trial court’s ruling on a Crim. P. 33 motion “with the same analytical lenses” that we employ when evaluating a postconviction court’s ruling on a Crim. P. 35(c) motion). B. Applicable Law ¶ 25 “Motions for a new trial based upon newly discovered evidence are looked on ‘with great disfavor,’ and the defendant has the 
10 burden of proving a new trial is warranted under a four-part test.” People v. Bueno, 2013 COA 151, ¶ 24, 411 P.3d 62, 70 (quoting People v. Hopper, 284 P.3d 87, 92 (Colo. App. 2011)). Specifically, the defendant must show that (1) the subject evidence was discovered after the trial; (2) the defendant and his counsel exercised diligence to discover all possible evidence favorable to the defendant prior to and during the trial; (3) the newly discovered evidence is material to the issues involved, and not merely cumulative or impeaching; and (4) on retrial, the newly discovered evidence would “probably produce an acquittal.” People v. Gutierrez, 622 P.2d 547, 559-60 (Colo. 1981); People v. Bonan, 2014 COA 156, ¶ 27, 357 P.3d 231, 235. ¶ 26 Similarly, “[c]ourts generally view a witness’s recantation of prior trial testimony with great suspicion.” People v. Schneider, 25 P.3d 755, 763 (Colo. 2001). Because new evidence in the form of a witness recantation, whether believed or not, necessarily serves to impeach the recanting witness’s credibility to some degree, “it can justify a new trial only to the extent that it not only impeaches the prior testimony but does so by contradicting it with a different and more credible account.” Farrar v. People, 208 P.3d 702, 708 (Colo. 
11 2009) (emphasis added). In measuring the credibility of a recanting witness and determining whether a jury would probably believe the witness’s new version of events, the trial court is not barred from relying on its own experience. Id. The court must consider all the testimony and circumstances, in addition to its own experience and observations of the witness. Id. C. Analysis ¶ 27 On appeal, Samuels argues that we “should allow [Davis] to correct his wrongdoing against Mr. Samuels by testifying at a new trial on his behalf in the interest of justice.” But he then concedes that Davis “would likely be an unavailable witness on retrial” because Davis invoked his privilege against self-incrimination to avoid testifying at the Crim. P. 35(c) hearing. ¶ 28 So at any retrial of Samuels, Davis’s recantation would presumably have to be admitted through the testimony of the defense investigator who met with Davis in 2021. However, unless a hearsay exception applies, that testimony would constitute inadmissible hearsay. CRE 801, 802. 
12 1. A “Statement Against Interest” Under CRE 804(b)(3) ¶ 29 That brings us to one of the central issues before us: whether the defense investigator’s testimony regarding what Davis told her in 2021 would be admissible under the hearsay exception of a “statement against interest” under CRE 804(b)(3). ¶ 30 A “statement against interest,” although hearsay, is admissible if the declarant is unavailable. CRE 804(b)(3). A statement against interest is one that: (A) a reasonable person in the declarant’s position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant’s proprietary or pecuniary interest or had so great a tendency to invalidate the declarant’s claim against someone else or to expose the declarant to civil or criminal liability; and (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability. CRE 804(b)(3). ¶ 31 As noted above, Davis’s unwillingness to testify at the Crim. P. 35(c) hearing and apparent unwillingness to do so at any retrial of Samuels make him “unavailable” under CRE 804(b)(3). See Stevens 
13 v. People, 29 P.3d 305, 310 (Colo. 2001), overruled on other grounds by People v. Fry, 92 P.3d 970, 975-76 (Colo. 2004). So we must consider whether Davis’s statement to the defense investigator met the definition of a “statement against interest” under CRE 804(b)(3)(A) and 804(b)(3)(B). ¶ 32 We assume, without deciding, that CRE 804(b)(3)(A) is met based on Davis’s claim that his recantation to the defense investigator could expose him to criminal liability for perjury. (Davis’s recantation could also expose him to criminal liability for attempt to influence a public servant and false reporting to authorities.) ¶ 33 However, Davis’s recantation does not meet CRE 804(b)(3)(B) because it is not “supported by corroborating circumstances that clearly indicate its trustworthiness.” (Emphasis added.) We reach that conclusion for four reasons. ¶ 34 First, we note Davis’s significant delay in coming forward with his recantation, which he made fifteen years after his trial. As another state supreme court has explained, skepticism [regarding the truth of recantations] increases with the passage of time. Recantation evidence appearing long 
14 after the trial has ended places the opposing party at a disadvantage similar to that which justifies statutes of limitations. Memories may have faded, witnesses may have disappeared or become incapable of testifying, physical evidence may be unrecoverable and the recanting witness may have had ample time to acquire an extraneous motive to falsify his original testimony. Haas v. Commonwealth, 721 S.E.2d 479, 482 (Va. 2012) (footnote omitted); see also In re Lambrix, 624 F.3d 1355, 1365 (11th Cir. 2010) (concluding that a recantation was “exceeding unreliable” because it was made twenty years after the witness testified against the defendant) (citation omitted); Christian v. Frank, 595 F.3d 1076, 1084 n.11 (9th Cir. 2010) (concluding that a recantation was “especially unreliable” because it was made more than a decade after the witness identified the defendant as the perpetrator). ¶ 35 Second, there is no indication in the record that Davis made the statements to the defense investigator under oath. In contrast, Davis testified that Samuels was the shooter under oath at his own trial in front of a jury in 2006. See Farrar, 208 P.3d at 709 (concluding that “a jury’s credibility determinations are entitled to respect” and “any inherent doubts about the trustworthiness of a self-impeaching witness must militate against, rather than in favor 
15 of, granting a new trial”). And there would be no way to cross-examine Davis about his prior sworn testimony and subsequent recantation because he was unwilling to testify at the Crim. P. 35(c) hearing and apparently would be unwilling to do so at any retrial of Samuels. ¶ 36 Third, Samuels’s proffered assertions regarding why Davis finally came forward with his recantation in 2021 are unpersuasive. For example, in Samuels’s Crim. P. 35(c) motion, he asserted that Davis came forward with his recantation after his release from parole because, “[n]ow that he knows he can’t be put away for life, he’s ready to tell the truth.” But once the jury effectively acquitted Davis on the first degree murder charge (and instead found him guilty of the lesser included offense of reckless manslaughter) in 2006, he could not be retried for first degree murder. See People v. Aguilar, 2012 COA 181, ¶ 19, 371 P.3d 1255, 1259 (“[A]n implied acquittal [on a greater offense] prevents retrial on the greater offense because a second trial would violate a defendant’s constitutional protection against double jeopardy. A defendant is impliedly acquitted of a greater offense when he or she is charged with greater and lesser offenses and the jury finds him or her guilty 
16 of only the lesser offense.” (quoting People v. Cardenas, 25 P.3d 1258, 1261 (Colo. App. 2000))). Further, even if Davis believed that the prosecution’s ability to retry him for first degree murder depended on whether he was still in custody on his conviction for reckless manslaughter, Samuels did not explain why Davis waited until 2021 to talk to the defense investigator, when he had been released from parole in 2017 or 2018. ¶ 37 Samuels also asserts that Davis is “in mourning for causing the unjust incarceration of his childhood friend.” But Davis did not plead guilty in exchange for an agreement to testify against Samuels at Samuels’s trial. Davis did not testify at Samuels’s trial and only testified that Samuels was the shooter after Samuels had been convicted. So the record does not indicate that Davis caused Samuels’s incarceration. ¶ 38 As the postconviction court found, the record indicates that Davis and Samuels were friends at the time of the shooting. The People argue it is unlikely that Davis would have testified at his own trial that Samuels was the shooter if Samuels had not, in fact, shot the victims. Regardless of Samuels’s arguments about Davis’s motivation to protect Q.W. (the brother of Davis’s girlfriend at the 
17 time), the main thrust of Davis’s testimony at his own trial appears to have been that he did not know in advance that his passenger was going to shoot at the victims (making the shooter’s identity a relatively unimportant issue at Davis’s trial). There is reason to question the credibility of Davis’s unsworn recantation because of the possibility that he is trying to free his friend from a sentence of life in prison without the possibility of parole. ¶ 39 Fourth, even considering only the substance of Davis’s recantation compared to the substance of his original trial testimony, Samuels fell far short of showing “corroborating circumstances that clearly indicate” Davis’s recantation was trustworthy, and that his original trial testimony was not. CRE 804(b)(3)(B) (emphasis added). ¶ 40 The evidence of Samuels’s guilt presented at his trial, although circumstantial, was strong. That evidence included the following: • The trial testimony of Davis’s then girlfriend (Q.W.’s sister) was consistent with her statements to a detective following the shooting — that she witnessed (1) Davis and Samuels leaving Davis’s house together before the shooting; (2) the two of them saying they were going to 
18 get some “oops” (meaning shoot at someone in the Bloods gang and, indeed, one of the victims was wearing all red that night); (3) a handgun in the waistband of Samuels’s pants before they left; and (4) them leaving in Davis’s girlfriend’s white Acura. • At trial, one of the surviving victims and another witness of the shooting were shown photographs of Davis’s girlfriend’s white Acura, and they testified that the car depicted in the photographs looked similar to the one used during the shooting. • After the shooting, testing of the white Acura revealed gunshot residue inside. • Davis’s girlfriend testified that, after the shooting, she witnessed (1) Davis and Samuels arriving back at Davis’s house and (2) Samuels wrapping his handgun in a shirt. When Davis’s girlfriend asked Samuels what had happened, he told her to “shut the fuck up.” • Gunshot residue was later found on Samuels’s jacket and shoes. And a cartridge found in Samuels’s jacket was the same caliber as the bullet casings found at the 
19 scene of the shooting, albeit from a different manufacturer. • A jailhouse informant, who was housed in the same jail as Samuels and Davis, testified that Samuels told the informant to pass along a message to Davis (1) that he and Davis would “get out of this” “scot free” if Davis would stop talking to the police and (2) threatening to kill Davis if Davis kept talking to the police. This evidence provides strong corroboration that Davis testified truthfully at his trial that Samuels was the shooter, and it thereby undermines the credibility of his recantation. ¶ 41 Indeed, some evidence supported Samuels’s alternate suspect defense that Q.W. was the shooter. Specifically, one of the surviving victims positively identified Q.W. as the shooter. However, several witnesses established an alibi for Q.W. at the time of the shooting. Specifically, several witnesses testified that Q.W. was sleeping with his girlfriend at his girlfriend’s house at the time of the shooting, which took place in the middle of the night. Those witnesses included Q.W.’s girlfriend, her mother, and her siblings. Further, when Q.W.’s ex-girlfriend heard the gunshots that night 
20 (she lived down the street), she telephoned the house where Q.W. was sleeping and spoke with Q.W. on the telephone. Beyond the surviving victim’s positive identification of Q.W., however, Samuels’s defense at trial heavily depended on arguments that numerous prosecution witnesses were lying to protect Q.W. ¶ 42 Given the evidence introduced at Samuels’s trial, as noted above, we conclude that Samuels failed to establish sufficient “corroborating circumstances that clearly indicate” the trustworthiness of Davis’s recantation. CRE 804(b)(3)(B) (emphasis added). 2. A “Different and More Credible Account” Under Farrar ¶ 43 For the same reasons, we also conclude that Samuels has not met the requirement in Farrar that, to be entitled to a new trial based on Davis’s recantation, the recantation must be “more credible” than Davis’s original trial testimony. 208 P.3d at 708. Davis made the recantation fifteen years after his trial testimony; although his trial testimony was under oath, the record shows that his recantation was not under oath; there was no way to cross-examine Davis regarding his recantation; Davis’s alleged reasons for recanting are unpersuasive; the evidence of Samuels’s 
21 guilt was strong; and there are insufficient corroborating circumstances showing that Davis’s recantation was trustworthy. ¶ 44 In light of our ruling, we need not address the People’s argument, and the postconviction court’s conclusion, that Davis’s recantation did not constitute newly discovered evidence. IV. Disposition ¶ 45 The order is affirmed. JUDGE FREYRE and JUDGE SCHUTZ concur.